READE, *Administrator of* READE, *against* LIVINGSTON and others.

A settlement after marriage, in pursuance of a *parol* agreement entered into before marriage, is not valid; *aliter*, if made in pursuance of a *written* agreement prior to the marriage.

Though a settlement after marriage *recites* a *parol* agreement entered into before marriage, *it seems*, that it is not, therefore, valid against creditors.

A voluntary settlement, after marriage, by a person indebted at the time, is fraudulent and void against all such antecedent creditors: and that without regard to the amount of the existing debts, or the extent of the property settled, or the circumstances of the party.

But, with regard to debts arising *subsequent* to the settlement, *it seems*, that the presumption of fraud, arising in law from the party being indebted at the time, may be repelled by circumstances: as, that the antecedent debts were secured by *mortgage*, or were *provided* for in the settlement.

And if the presumption of fraud is not so repelled, *it seems*, that *subsequent* creditors may impeach the settlement, by showing *antecedent* debts sufficient in amount to afford reasonable evidence of a fraudulent intent: for, as on the one hand, showing an antecedent debt, however small or trifling, is not sufficient to make the settlement fraudulent and void; so, on the other, the subsequent creditor, to impeach it, is not obliged to prove that the party was absolutely *insolvent* at the time.

In 1800, *H. G. Livingston* was indebted to the intestate, who brought an action against *H. G. L.*, and recovered a judgment in the Supreme Court, for 6,000 dollars and 42 cents, debt, and 92 dollars and 50 cents, costs, which was docketted the 7th of *August*, 1807. During this time, as the plaintiff alledged, *H. G. L.* owned real property to the value of above 40,000 dollars, but his personal estate was insufficient to pay this debt. On the 7th of *December*,

1805, *H. G. L.* executed a deed to *G. Aspinwall*, defend-ant, (for the consideration of 5,000 dollars, expressed,) of certain lands, being 5,483 acres in the county of *Ontario*, a lot of land in the city of *New-York*, and a farm in *Dutchess County*, IN TRUST, to convey the same to such persons and for such uses, and in such manner, as *Ann, his wife*, by any act or deed in writing, or by will, should direct and appoint; and in default thereof, then in *trust* for her heirs, to be conveyed to them by the trustee; and in trust, that the said *Ann* should be permitted to take and receive the rents and profits to her separate use, and her separate receipt to be a sufficient discharge, &c.; which deed the plaintiff alleged to be voluntary and fraudulent, and made with a view to defeat the intestate and other creditors.

The trustee, afterwards, conveyed part of the lands to *bona fide* purchasers, the proceeds of which had been re-ceived by the wife, or *cestuy que trust ;* and the plaintiff alleged, that the residue remaining in the trustee, was worth above 40,000 dollars; that, on the 12th of *July*, 1809, *H. G. L.* paid part of the debt due to the intestate, but that there now remained due on the judgment, 3,072 dollars; and there was no visible property of *H. G. L.* out of which the same could be paid or satisfied, except the lands so held by *G. A.*, in trust, and that the wife refused to direct the payment out of those lands. The bill, which was filed the 29th of *January*, 1816, prayed, that *G. A.* might be directed to sell and convey so much of the land, undisposed of, as might be sufficient to pay the balance due the intestate, and for other relief, &c.

The defendants, *H. G. L.* and his wife, in their answer, admitted, that in 1800, there were unsettled accounts be-tween him and the intestate, which, by a rule of the Supreme Court, were referred to referees, who, in *August* term, 1807, reported the sum of 6,000 dollars and 42 cents, due to the intestate, for which judgment was render-

ed in his favour, with costs. That *H. G. L.* was seized of the lands mentioned in the bill at the time of the judgment, but not before he became so indebted to the intestate, particularly as to the lands in *Ontario*, which were unimproved. He denied that the lands mentioned in the bill were worth near the sum of 40,000 dollars, but admitted that the lands mentioned in the deed of trust comprised the greatest part of his real estate. He stated, that when he executed the deed, he was actually worth 40,000 dollars, and that his debts did not amount to 10,000 dollars; and he denied that the deed was executed with any fraudulent intent. He alleged, that prior to, and in contemplation of his marriage, and in consideration of such marriage, he agreed with *V. N.*, the father of his wife, that in case of the marriage, he would settle upon her and her children, 30,000 dollars; that he was then worth 80,000 dollars; and that, afterwards, at the particular instance of *V. N.*, and in compliance with his agreement, he executed the deed. He admitted the balance due to the plaintiff, as charged. He stated, that for several years after the judgment, he resided at *Harlaem*, and had horses and carriages and a well furnished house, and that the plaintiff might have obtained satisfaction out of his personal property. That he is now worth but little, having been confined to his bed for the last ten years, and expended nearly all his estate; that the lands conveyed in trust have not produced sufficient to defray the ordinary expenses of his wife and five children. The wife, in her answer, insisted, that as her whole life had fallen a sacrifice to the unfortunate condition of her husband, and having five children to support and educate, the deed could not be considered as made with any fraudulent intent; and that it was the delay of the plaintiff in enforcing the payment of his debt, that had caused the injury of which he complained.

1818.

READE
v.
LIVINGSTON.

It was proved that, in 1794, *H. G. L.* owned a farm at *Red Hook,* which he bought of the intestate for 10,000 dollars, and which he afterwards sold to *E. Kane* for 1,000 dollars in cash, and about 7,000 acres of new land, at two dollars per acre, part of which lands were comprised in the deed of trust. That, previous to 1807, *H. G. L.* built a house at *Harlaem,* on the land of *V. N.,* which cost about 8,000 dollars, which was afterwards sold, and the money paid to *V. N.,* on account of the debts of *H. G. L.*

*V. Nutter* stated, that his daughter was about 16 years of age, in 1791, when she married *H. G. L.* who was then supposed to be affluent; that just before the marriage, the wife of the witness informed him that *H. G. L.* had promised, if they would consent to the marriage, to settle 30,000 dollars on their daughter, after the marriage. That the witness afterwards reminded *H. G. L.* of his promise, who answered the witness that he need not be uneasy, that he had made such a promise, and intended to fulfil it. Another witness also proved the admission by *H. G. L.* of his having made the promise of settlement on his wife. That *H. G. L.* who died in the summer of 1817, was bed ridden and helpless during the last ten years of his life. That, in 1807, his personal property was not worth more than 1,000 dollars, and he possessed no real estate free from incumbrance.

It appeared that the debt due the intestate originated in two bonds, dated *October* 31st 1794, one for 1,000 pounds, and the other for 1,510*l.* 17*s.* 4*d.,* and which were given for the farm at *Red Hook,* purchased by *H. G. L.* of the intestate.

June 16th, 17th, and 18th. *P. Ruggles,* for the plaintiff.

*T. A. Emmet,* and *M. S. Wilkins,* for the defendants.

The cause stood over for consideration; and the following opinion was, this day, delivered by the court.

1818.

READE
v.
LIVINGSTON.

September 28th.

THE CHANCELLOR. This case turns upon the validity of the conveyance by *Henry G. Livingston* to *Gilbert Aspinwall*.

The bill charges, that *Livingston* was indebted to *John Reade*, the plaintiff's intestate, as early as the year 1800, in 6,000 dollars, and that in *August* term, 1807, *Reade* obtained a judgment against *H. G. L.*, for upwards of that sum, and that 3,072 dollars of it remains unpaid. That by deed, dated the 7th of *December*, 1805, *H. G. L.* conveyed his lands, to the amount in value of 45,000 dollars, to *Aspinwall*, in trust for his wife, and that he had no other property to satisfy the balance of the judgment.

The answer, of *H. G. L.*, and of his wife, admitted, that in 1800, there were sundry unsettled accounts between the parties, and that they were finally, by rule of court, referred to referees, and that the judgment upon such reference was rendered, as charged in the bill; they admit further, that the lands included in the deed to *Aspinwall*, composed the greater part of the real estate of *H. G. L.*, though they deny the lands to be of the value charged. *H. G. L.* states, that prior to his marriage, and with a view to it, he *agreed with his wife's father* to settle on her, and her children, 30,000 dollars, and that the deed was executed in pursuance of that agreement. He admits the sum of 1,392 dollars, and 92 cents, to be still due upon the judgment, and that *Reade* might have obtained satisfaction out of his personal estate; and he declares, that he was then worth little or no property, though at the time of his marriage, he was worth 80,000 dollars.

It appears, by the proof taken in the cause, that the judgment was founded upon two bonds dated in the year 1794; that the consideration of them was a farm sold by *Reade* to *H. G. L.*, and that with the proceeds, or

1818.

READE
v.
LIVINGSTON.

by the exchange of that farm, *H. G. L.* procured the great-er part of the lands included in the deed of settlement. That he was married as early as the year 1791, and that at the date of the judgment he owned personal property to 1,000 dollars, but it does not appear that he possessed any real property free from incumbrance. *Valentine Nutter*, the wife's father, says, that his wife, Mrs. *Nutter*, informed him, just previous to the marriage, that *H. G. L.* had promised to settle 30,000 dollars on his daughter, and that *H. G. L.*, frequently, after the marriage, had admitted the promise, and, at last, at the repeated request of the witness, executed the deed.

The deed to *Aspinwall* contains no reference to, or recital of any previous agreement, but it is simply a deed in fee, for the consideration of 5,000 dollars, and in trust to convey the lands, and the rents and profits thereof, as the wife of *H. G. L.*, by deed or will, should direct; and, in default of such direction, in trust for her heirs.

I have stated, perhaps, as much of the pleadings and proofs as may be requisite to a full understanding and discussion of the important legal questions involved in the case.

*H. G. L.* owed the very debt now in question, at the time of the settlement of his real estate upon his wife; and a great part of the lands so settled, were purchased with property procured by that same debt. The deed of settlement was not made until 14 years after the marriage, when, it is admitted, that, in the mean time, his estate had diminished one half. It had no reference or allusion to any ante-nuptial contract, nor is there any evidence in writing of such an agreement.

Upon such a state of facts, my earliest impressions were against the soundness of the defence; and I apprehend, there is not a case to be met with that gives any colourable support to such a settlement against such a creditor. But after the elaborate argument which has been made in fa-

vour of the deed, I have considered it due to the counsel, as well as to the importance of every question of this nature, to look into the cases, and to give to every topic of argument a careful investigation.

The settlement was a voluntary one. There was no portion advanced by, or on behalf of the wife, nor was it founded on any ante-nuptial contract duly ascertained, or on any other valuable consideration. The only attempt at any support of that kind, is the parol promise stated in the answer of *H. G. L.* to have been made by him previous to his marriage, and which is mentioned also by some of the witnesses. There are several reasons why I think the settlement cannot derive any aid from that parol agreement.

The proof of the agreement consists only of parol declarations and confessions of *H. G. L.*, made after his marriage. All that Mr. *Nutter* knows beyond those confessions, is from information given to him by his wife. We have no proof in writing, or from any person present, of any agreement made prior to the marriage, and in consideration of it. The proof, such as it is, is extremely loose. The answer of *H. G. L.* states, that he agreed, prior to the marriage, *with his wife's father*, to settle on her and her children 30,000 dollars, but Mr. *Nutter* does not pretend that any such agreement was made with him. The agreement, as the answer states, was also to settle that sum on the wife *and her children*, whereas, the deed gives the entire and absolute disposal of it to the wife. The amount was to be 30,000 dollars, whereas the deed was of a large quantity of land, being the greater part of his real estate, without any certain defined value; and he only denies its value to be 40,000 dollars. The settlement and the agreement do not, therefore, correspond with any precision, and not being made until fourteen years after the marriage, and having no allusion to it, every intendment in favour of the settlement as being the performance of a

1818.

**READE**
**v.**
**LIVINGSTON.**

prior agreement, seems to fail. In *Lavender* v. *Black-stone*, (2 *Lev.* 146. 27 *Car.* II.) there was a parol pro-mise by an infant on marriage, to settle an estate when he came of age, and though the court considered such a parol promise might be good, (it being before the existence of the statute of frauds,) yet the K. B. held, in that case, that " the settlement not being made until three or four years after he came of age, and not being made directly, ac-cording to the promise, it should not be presumed to be made in performance of the promise, without a direct proof to that purpose," and it was held, in that case, to be fraudulent.

*A settlement after marriage, in pursuance of a parol agree-ment entered into before marriage, is not valid.*

If the present case had, therefore, arisen prior to the statute of frauds, I apprehend it would have been deem-ed a fraudulent settlement in regard to the existing credi-tors, from the want of a sufficient connexion in point of time, and of correspondence in point of proof, between the settlement and the alleged agreement. And, if it did correspond, the proof of the agreement is defective. To support such a settlement upon no other proof of the prior agreement than the declarations of the husband during coverture, would be to overturn the statute of frauds, and to produce the most lax and dangerous doc-trines. Every fraudulent debtor might easily render such doctrines subservient to his views, for he has only to de-clare that he makes such a settlement in consequence of a prior agreement, and he can then transfer all his estate to his family, and defraud his creditors. But this cannot be the sound rule, and we ought, at least, to require from the person setting up the settlement, direct and certain proof of the agreement, independent of these interested and suspicious declarations of the party himself.

*But a settle-ment after mar-riage, made in pursuance of a valid or writ-ten agreement before marri-age, is good.*

A settlement after marriage, in pursuance of a valid agreement before marriage, may be good and binding. This was so admitted in the cases of *Jason* v. *Jervis*, (1 *Vern.* 284.) and *Ramsden* v. *Hylton*. (2 *Vesey*, 304.

And in the case of *Griffin* v. *Stanhope*, (*Cro. Jac.* 454.) and in Sir *Ralph Bovy's* case, (1 *Vent.* 193.) a settlement after marriage in pursuance of a prior parol agreement, was held good. But these were cases prior to the statute of frauds, (29 *Charles* II.) which renders void all parol promises, in consideration of marriage; and, therefore, since the statute, it has been determined, that the agreement, to be valid, must be in writing. Thus, in *Montacute* v. *Maxwell*, (1 *Str.* 236. 1 *P. Wms.* 618.) the wife filed her bill to oblige her husband to settle her own estate to her separate use, setting forth a parol promise before marriage to do it. The defendant pleaded the statute of frauds as to any parol promise, and Lord Ch. *Parker* allowed the plea, and observed, that the court could not take cognizance of such a promise, without "breaking the very words and intention of the statute." He thought, however, that if the husband, after marriage, had, in writing, admitted the former agreement, it might have been material, and a sufficient consideration to support a subsequent promise in writing. In the case of *Dundas* v. *Dutens*, (1 *Vesey, jun.* 196.) this point was much discussed. In that case there was a settlement of the wife's property after marriage, reciting a parol agreement before marriage, to settle her property, and settling it in pursuance of that agreement, and a bill by the creditors to set aside the settlement. On the part of the plaintiffs, it was contended, that there was no such agreement as was alleged ; and if there was, that the parol agreement was void under the statute. The Lord Chancellor thought that a suit after marriage on a parol agreement for a settlement upon marriage, and on the ground of part performance, would not do, because the statute is so explicit ; and he adds, " but is there any case where, in the settlement, the parties recite an agreement before marriage, in which it has been considered as within the statute ?" Sir *John Scott*, who was then Solicitor General, did not think it would be good, and the Chan-

1818.

READE
v.
LIVINGSTON.

cellor said " he would be glad to hear how the counsel would support the settlement."

The cause went off on another point; and the case, though containing no decision on the question, is, as far as it goes, rather an authority against the validity of a settlement after marriage, though it contains a recital of a prior parol agreement. It seemed to be admitted, that the parol agreement, as such, was null, and that if it had any effect, it derived it entirely from the recital of it in the deed.

Afterwards in *Randall* v. *Morgan*, (12 *Vesey*, 67.) the Master of the Rolls alludes to the *dicta* in this case, and observes, that the effect of a settlement, with such a recital and supposing the parol agreement to have had actual existence, appears not to have been decided; but he doubted extremely, whether a letter after marriage, referring to a parol promise before marriage, would bind; for " the promise being in itself a nullity, producing no obligation, a written recognition after the marriage would give it no validity."

Sir *Wm. Grant* may not have recollected an anonymous case in *Precedents in Chancery*, p. 101, where a settlement after marriage, recited to be in consideration of a portion secured, was held to afford a presumption of a previous agreement. But such a loose note of the decision is scarcely worth observation as an authority, and is not to be compared with any opinion of this distinguished judge.

It ought here to be noticed, also, that the case of *Dundas* v. *Dutens*, is a little differently reported in 2 *Cox's Cases in Chancery*, p. 235.; and Lord *Thurlow* is there made to say, that the settlement, with a recital of a prior parol agreement, was valid, but that if it was not so, the plaintiffs had no equity against the fund which they sought. We cannot say, from this report of the case, on which ground the bill was dismissed, nor does it even appear, whether

*Margin:* 1818. / Reade v. Livingston.

the creditors were prior or subsequent to the settlement. A case so uncertain and so variously reported, can be of no material use or authority.

*Roberts*, in his *Treatise on Fraudulent Conveyances*, p. 243., seems to think it settled, that proof of a parol agreement before marriage will support the subsequent settlement against the claims of creditors and purchasers. And yet, he says, it cannot be denied that such parol agreements are within the statute of frauds, and have no legal obligation, and are without legal remedy, " and no proof can be admitted to give them a substantive validity." There are, however, he continues to observe, " many instances, both at law and in equity, of *their influence* on the construction and efficacy of written agreements!" A writer that will dictate in such a heedless and inconsistent manner, is not to be regarded ; and though, I think, that all questions of this kind ought to be decided upon principles to be deduced from a critical examination of adjudged cases, and are not to rest upon the loose observations and speculations of elementary writers, yet, I may, in this instance, refer to the able and excellent Treatise of Mr. *Atherley on Marriage Settlements.* He says, (p. 149.) that the doctrine cannot possibly be sustained, that a settlement after marriage can rest its validity, as against creditors, on a mere parol agreement before marriage; for the agreement can only be proved by parol evidence; and to admit such evidence would be inconsistent with the spirit and design of the statute of frauds.

I doubt much whether a post-nuptial settlement can be held valid as against creditors, by the mere force and effect of a *recital* in it of a prior parol agreement. The weight of authority, as well as the reason and policy of the case, I should be inclined to think, are against it; but whatever may be the rule in that case, it is sufficient to observe, that the settlement in question has *no recital*, and is not attended with any written recognition whatever of any prior

1818.

READE
v.
LIVINGSTON.

*Though a settlement after marriage recites a parol agreement entered into before marriage, it seems, that it would not, therefore, be valid against creditors.*

1818.

READE
v.
LIVINGSTON.

agreement. There is not a single case that gives counte-- nance to such a settlement. The decision in *Beaumont* v. *Thorp*, (1 *Ves.* 27. *Belt's Supp.* S. C.) seems to be completely in point. That was a settlement in consideration of a marriage already had, and, as Lord *Hardwicke* observed, "without recital of any articles before the marriage, and so on the face of it voluntary." He declared it fraudulent against creditors, under the statute of *Eliz.*, as the party was indebted to the plaintiff when he made the settlement.

A voluntary settlement after marriage by a person indebted at the time, is fraudulent and void against creditors.

If the settlement be considered, as I think it ought to be, unconnected with any ante-nuptial agreement, the simple question then is, whether such a voluntary settlement after marriage by a party, indebted at the time, be not, as against such creditors, absolutely fraudulent and void.

I think this question can be most satisfactorily answered in the affirmative; but the manner in which it has been argued, imposes on me the necessity of reviewing the cases.

As early as the case of *Shaw* v. *Standysh*, (2 *Vern.* 326.) the distinction on the subject of voluntary conveyances, seems to have been taken and understood, between creditors existing at the time of the conveyance, and subsequent creditors, and that it was clearly void as to the former, though not, as of course against the latter. This was so advanced upon argument in that case, and, perhaps, it was a distinction of common law growth; for it was agreed in *Twyne's Case*, (3 *Co.* 83. *a.*) that an estate made by fraud shall be avoided only by him who has prior right, but he who hath subsequent right shall not avoid it. But in the Exchequer case, of *St. Amand* v. *Barbara*, (*Comyn's Rep.* 255.) a settlement was made upon a child by a party indebted by bond, and who afterwards became also indebted by bond. It was admitted as a doubtful point, whether, if the party had not been indebted at the time, the settlement would have been fraudulent as against the subsequent

1818.

REAPE
v.
LIVINGSTON.

creditors; but as the party was indebted at the time, the settlement was void against debts contracted *afterwards*, and all the bond creditors were allowed to come in as against the settlement. If the rule was otherwise, it was said in this case, that the same result would follow in another way; for the subsequent bond creditors would be permitted to stand in the place of the prior bond creditors, and the assets be so marshalled as to satisfy all.

Lord *Talbot* considered it a doubtful point, and forbore an opinion, in *Jones* v. *Marsh*, (*Cases Temp. Talbot*, 63.) whether a voluntary settlement, without consideration, would be held fraudulent as against a subsequent creditor of many years afterwards. But though there might be doubts on the point at that day, it seems to have been long since settled, that if the party be not indebted at the time, and has no fraudulent views, a *subsequent creditor* cannot impeach a prior settlement, on the mere ground of its being voluntary. This point was fully explained by Lord *Hardwicke* in *Russel* v. *Hammond*, (1 *Atk.* 15.) where, speaking of voluntary conveyances, he says, he has hardly known a case where the person conveying was indebted at the time, and the settlement not deemed fraudulent; but the conveyance is not fraudulent where the party making it is not indebted at the time. Subsequent debts will not shake such a settlement, unless there be some badge of actual fraud, as a continuance in possession.

The observation of the Chancellor, that "he had hardly known a case," would imply, that there had been cases in which a voluntary settlemment was held good, even though the party was indebted at the time. But it is sufficient to observe that no such case appears; and we cannot place great reliance on the report, as to the precise words used by the court; especially, as Lord *Hardwicke* speaks, in other cases, without any such qualification.

In *Stileman* v. *Ashdown*, (2 *Atk.* 477.) *Brown* v. *Jones,* (1 *Atk.* 190.) *Wheeler* v. *Caryl,* (*Amb.* 121.) and *Hylton* v. *Biscoe,* (*Ves.* 304.) Lord *Hardwicke* defined what were good settlements after marriage, as against creditors; and he held those good which were made in consideration of a portion paid at the time, by, or on behalf of the wife, or in consideration of an agreement by articles before marriage. Such settlements are of equal validity with those made before marriage, in consideration of marriage, and which, it is agreed, are good, even though the party be then indebted. (*Nairn* v. *Prowse,* 6 *Vesey,* 759. *Campion* v. *Cotton,* 17 *Vesey,* 271, 2. *George* v. *Milbanke,* 9 *Vesey,* 193.) But he said, if the settlement after marriage was in consideration of marriage only, it was voluntary and fraudulent against creditors; and though he was not even indebted at the time, yet if he made the settlement with a view to a future indebtedness, it was equally fraudulent. So, in *Ward* v. *Shallet,* (2 *Vesey,* 18.) he admits a settlement after marriage, in consideration of a portion advanced, or in consideration of the wife parting with a contingent interest secured by her husband's *bond,* before marriage, to be good; but still he qualifies the admission by saying, there must be no " fraud or great inadequacy."

All the cases assume the position to be undeniable, that the husband must not be indebted at the time of the settlement. They leave no possible doubt on the point. In *Middlecome* v. *Marlow,* (2 *Atk.* 519.) Lord *Hardwicke* held a post-nuptial settlement good, " there being no proof of the husband being indebted at the time; there was not so much as a single creditor." The settlement in this case was also very reasonable, it being only of the personal estate received from the wife. So, again, in *Taylor* v. *Jones,* (2 *Atk.* 600.) a settlement after marriage on the wife and children was held fraudulent, as to creditors, under the 13th *Eliz.*; and this case is worthy of no-

ace for the doctrines which it contains. The settlement
was held to be fraudulent, as well in respect to creditors
*after*, as before the settlement, for the debtor *continued
in possession* of the property settled ; and the statute of
*Eliz.* was held to extend equally to the subsequent credi-
tors who were delayed or defrauded.  It was further ob-
served by the Master of the Rolls, " that it was not ma-
terial in that case, what the circumstances of the father
were at the time of the settlemnt, any farther than as
evidence to show, if he was in indigent circumstances,
that it was made with an *intent* to commit a fraud."

This case contains also a just observation on the sym-
pathy which is usually excited, or attempted to be excited,
in these cases, in favour of the objects of the settlement.
" I have always," observes the Master of the Rolls, " a great
passion for wife and children ; yet, on the other side,
it is possible, if creditors should not have their debts, *their*
wives and children may be reduced to want."

In *Walker* v. *Burrows* (1 *Atk.* 93.) Lord *Hardwicke* ad-
mitted, most explicitly, that if the party was indebted at
the time, the voluntary settlement was void; and he ad-
mitted, with equal certainty, that if the party was not in-
debted at the time, or immediately after the execution
of the deed, (which would be evidence of intentional
fraud,) the provision for the wife and children would not
be affected by subsequent debts.   But if the fact of indebt-
edness at the time be etablished, then it was held, that " it
would have run on so as take in all subsequent credi-
tors."    Mr. *Maddock* 1 *Madd. Ch. Rep.* 420. note.)
says he has seen a MS. note of this case and that it
agrees with the printed report : and this case may be
considered as establishing the doctine, as far as the deci-
sion of Lord *Hardwicke* could establish it, that indebted-
ness at the time will defeat a post-nuptial voluntary set-
tlement, and that if it be set aside in favour of a creditor at

the time, all the subsequent creditors are let in on the principle of equal apportionment, or marshalling of assets. Lord *Hardwicke's* decisions are all consistent on this interesting subject.

Thus, in *White* v. *Sansom*, (3 *Atk.* 410.) it was a doubtful point, whether the plaintiff's debt accrued until after the settlement; and on that doubt the bill was dismissed. In *Beaumont* v. *Thorp*, already cited, the settlement was by a man indebted at the time, and it was set aside, and all the specialty creditors, before and after the settlement, were let in. So, in Lord *Townshend* v. *Windham*, (2 *Vesey*, 1.) Lord *Hardwicke* expressed himself in the most explicit and decided manner. He said, that he took it, that a man " actually indebted, and conveying voluntarily, always meant to defraud creditors." I understand him to mean here, that this was the conclusion of law, which was not to be gainsayed; and he said he knew of no case where a voluntary conveyance to a child by a man indebted at the time, was not set aside for the benefit of creditors; but he said, that a voluntary conveyance without any badge of fraud, and by a person not indebted at the time, would be good, though he afterwards became indebted. He spoke strongly in favour of the superiority of the claims of creditors over family provisions, and observed, that "though an unfortunate case may arise in respect to children, for whom parents are bound by nature to provide, it is impossible to say, the consideration in respect of them is of so high a nature as that of paying just debts, and, therefore, the court never preferred them to just creditors." In *Fitzer* v. *Fitzer*, (2 *Atk.* 511.) Lord *Hardwicke* asked the Attorney General if there was an instance in that court where a conveyance from husband to wife, without any pecuniary consideration moving from the wife, had been held to be good against creditors.

The same rules and distinctions are declared and en= forced throughout the subsequent decisions.

In *Stephen* v. *Olive*, (2 *Bro.* 90.) a settlement was made after marriage, by a person not indebted except in 500 pounds, secured by mortgage on the settled estate, and the Master of the Rolls held, that a settlement after mar= riage, in favour of a wife and child, by a person not indebt= ed at the time, was good against subsequent creditors, and he refused to grant relief in this case to a subsequent creditor, notwithstanding the settler was indebted at the time, seeing that the debt existing at the time was secured by a mortgage on all the estate settled. And Lord *Eldon* afterwards, in *George* v. *Milbanke*, (9 *Vesey*, 193.) allows of the same exception, when he says, that if the volunta= ry settlement contains a provision for the payment of debts then existing, that makes it good against all future cre= ditors.

It cannot escape observation, that the only question in these cases was respecting the subsequent creditors. There is no doubt in any case as to the safety and security of the then existing creditor. No voluntary post-nuptial settlement was ever permitted to affect him ; and the cases seem to agree, that the subsequent creditors are let in only in particular cases ; as where the settlement was made in contemplation of future debts, or where it is requisite to interfere and set aside the settlement, in favour of the prior creditor, or where the subsequent creditor can impeach the settlement, as fraudulent, by reason of the prior in= debtedness.

But the case of *Lush* v. *Wilkinson*, (5 *Vesey*, 384.) has= been much relied upon, as if it gave more strength to the settlement against subsequent debts, than the prior cases seem willing to allow.

The settlement in that case was on the wife, after mar= riage, of an annuity charged upon lots subject to two mort= gages. The bill was by a subsequent creditor against the

executor and widow of the husband, to set aside the deed granting the annuity, and charged that the husband was indebted to several persons, and in insolvent circumstances, at the date of the deed. The answer averred that the husband was not insolvent, and that, except the two mortgages, he did not owe above 100 pounds at the time, and that none of the debts were due at his death.

It was contended, on the part of the defendants, that there was no evidence of any debt at the time, except the two mortgages, for the plaintiff produced no testimony ; and the opinion of Lord *Mansfield*, in *Doe* v. *Routledge*, (*Cowp.* 705.) was referred to, in which he considers that the validity of a voluntary settlement depended on the fact whether the settler was indebted at the time. The counsel on the other side admitted the law to be, that there must be a debt at the time. Lord *Alvanley*, the Master of the Rolls, then observes, that the plaintiff appeared as a subsequent creditor, and without proving any one antecedent debt, and he comes with a fishing bill, and desires an account and an inquiry, in order to prove antecedent debts ; and the bill was dismissed with liberty to file another.

This was the case of a subsequent creditor, and therefore it does not apply to the case before me except so far as it assumes, like all other cases, the rule to be settled, that a voluntary settlement never can impair a subsisting debt. But there is a *dictum* of the Master of the Rolls in this case which has been thought to be of some moment, where he observes that a single antecedent debt will not do. Every man must be indebted for the common bills for his house. It must depend upon this whether he was in insolvent circumstances at the time.

Such a loose *dictum* one would suppose, was not of much weight ; especially, as there is no preceding case which gives the least countenance to it. Another Master of the Rolls had before said, in *Taylor* v. *Jones*, already cited, that the circumstances of the settler at the time of

the settlement, were not material, except as to the question of actual, intentional fraud; and *that* intention, we know, is never the inquiry in respect to the demands of the prior creditors. If insolvency can ever be made a question, as to these voluntary settlements, it can only be in respect to the subsequent creditors, and Lord *Alvanley* was speaking of such a case, and of none other. But even here the cases are numerous to show, that if the settlement be once set aside by the prior creditors, subsequent creditors are entitled to come in, and be paid out of the proceeds of the settled estate.

In *Kidney* v. *Coussmaker*, (12 *Vesey*, 136.) the question was on a post-nuptial settlement as against creditors, and it was insisted, that they were entitled to defeat it, if the settler was indebted at the time; but there was said to be no proof of a single debt existing at the date of the settlement. Sir *Wm. Grant*, in giving his opinion, observed, that in *Lush* v. *Wilkinson*, the bill was filed for the purpose of affecting the settlement, upon the ground, that the settler was insolvent at the time it was made, and that there was no evidence in support of such a charge, and the bill was dismissed. He said he was disposed to follow the decision of Lord *Rosslyn*, in *Montague* v. *Lord Sandwich*, (*July*, 1797, cited, *ib.* p. 148., and 5 *Vesey*, 386. note,) that the settlement was fraudulent only as against such creditors as were creditors at the time.

Lord *Rosslyn*, in the case referred to, declared a settlement void as to the creditors, prior to its date. There was no question of insolvency made, but it was clearly held, by Lord *Rosslyn*, in that case, (see 12 *Vesey*, 156. note,) that if the settlement be affected as fraudulent against such creditors, the subject is thrown into assets, and all subsequent creditors are let in.

The last case on the subject which I shall notice, is that of *Holloway* v. *Millard*. (1 *Maddock's Ch. Rep.* 414.) That was a bill by creditors against the parties to a volun-

1818.

READE
v.
LIVINGSTON.

tary settlement upon a natural child, praying, that the deficiency of assets, if any, might be made good out of the settled estate. The plaintiffs were subsequent creditors, and the bill did not state that the party was indebted when the settlement was made.

The counsel for the plaintiffs contended, that if it was necessary to show, that the party was indebted at the time, a reference ought to be ordered for that purpose, but it was observed, on the other side, that there was no charge in the bill to warrant the inquiry, and that a man must be indebted, and largely so, to render the settlement invalid, mere trifling debts in the course of house-keeping would not be sufficient.

The Vice-Chancellor, in giving his opinion, said, that the settler here was not indebted at the time, and that a voluntary conveyance could not be avoided by subsequent creditors, except on the ground of a fraudulent intent ; for that it was clear, that a voluntary settlement even in favour of a stranger, by a person not indebted at the time, nor meaning a fraud, was good against subsequent creditors. But he said, further, that a voluntary disposition even in favour of a child, was not good if the party was indebted; and he refused an inquiry, whether the party was indebted at the time, because there was no foundation for such an inquiry laid by the bill.

A voluntary settlement by a person indebted, is presumed fraudulent as against all existing debts, without regard to their amount, or to the extent of the property settled, or to the circumstances of the party.

The conclusion to be drawn from the cases is, that if the party be indebted at the time of the voluntary settlement, it is presumed to be fraudulent in respect to such debts, and no circumstance will permit those debts to be affected by the settlement, or repel the legal presumption of fraud. The presumption of law in this case, does not depend upon the amount of the debts, or the extent of the property in settlement, or the circumstances of the party. There is no such line of distinction set up, or traced in any of the cases. The attempt would be embarrassing, if not dangerous to the rights of the creditor, and prove an inlet to

fraud. The law has, therefore, wisely disabled the debtor from making any voluntary settlement of his estate, *to stand in the way of his existing debts.* This is the clear and uniform doctrine of the cases, and it is sufficient for the decision of the present cause.

With respect to the claims of subsequent creditors, there is more difficulty in arriving at the conclusion, and I am not called upon in this case to give any definitive opinion, for there are no such creditors before the court. But since the subject has been examined, I would suggest what appears to me, at present, but with my mind still open for further discussion and consideration, to be the better opinion from the cases; it is, that the presumption of fraud as to these creditors, arising from the circumstance, that the party was indebted at the time, is repelled by the fact of these debts being secured by mortgage, or by a provision in the settlement; that if no such circumstance exists, they are entitled to impeach the settlement by a bill properly adapted to their purpose, and charging, and proving indebtedness at the time, so that their rights will not depend on the mere pleasure of the prior creditors, whether they will or will not impeach the settlement; that the question then arises, to what extent must the subsequent creditors show a prior indebtedness? Must they follow the *dictum* of Lord *Alvanley*, and show insolvency, or will it be sufficient to show any prior debt, however small, as is contended for by Mr. *Atherley*, with his usual ability, in his Treatise on *Marriage Settlements?* (*Ath. Mar. Set.* p. 212. to 219.) I should apprehend, that the subsequent creditors would be required to go so far, and only so far, in showing debts, as would be sufficient to raise reasonable evidence of a fraudulent intent. To show any existing debt, however trifling and inevitable, (to which every person is, more or less, subject,) would not surely support a presumption of fraud in fact; no voluntary settlement in any possible case could stand upon that construction.

*But with respect to subsequent debts, it seems, that the presumption of fraud arising from the party being indebted at the time, may be repelled by circumstances; as that the existing debts are secured by mortgage, or by a provision made for them in the settlement.*

*And subsequent creditors may impeach the settlement, on the ground of prior indebtedness; if he can show antecedent debts sufficient in amount to afford reasonable evidence of a fraudulent intent; for he is not obliged to show the absolute insolvency of the person making the settlement.*

1818.

READE
v.
LIVINGSTON.

I should rather conclude, that the fraud in the voluntary settlement, was an inference of law, and ought to be so, as far as it concerned existing debts; but that as to subsequent debts, there is no such necessary legal presumption, and there must be proof of fraud in fact; and the indebtedness at the time, though not amounting to insolvency, must be such as to warrant that conclusion. It appears, in all the cases, (and particularly in the decision of Sir *Thomas Plumer* since the publication of *M. Atherley's* treatise) that a marked distinction does exist, under the statute of 13 *Eliz.* between prior and subsequent creditors, in respect to these voluntary settlements; and it is now settled, that the settlement is not void, as of course, against the latter, when there were no prior debts at the time.

*Under the 13 Eliz. c. 5., (sess. 10. ch. 44. s. 3.) there is a distinction between prior and subsequent creditors, in regard to voluntary settlements.*

The law in *Massachusetts* seems to be laid down according to this view of the subject.

In *Bennett* v. *Bedford Bank*, (11 *Tyng*, 421.) there was a voluntary conveyance to a son by a father, indebted at the time, but not in embarrassed circumstances, or equal in debt to the value of his property. The debt to the plaintiff did not accrue until several years afterwards. It was held by the court, that as there was no fraud in fact, the deed in this case was good against the subsequent creditor, " and against all persons but such as were creditors at the time."

But there is a case, recently decided by *the Supreme Court of Errors of Connecticut*, (*Salmon* v. *Bennett*, 1 *Day's Conn. Rep. N. S.* p. 525.) which lays down a rule somewhat different from that which I have deduced from the *English* cases.

The question arose in an action of ejectment. The plaintiff had purchased *Virginia* lands of *Sherwood*, in 1794, and paid him the purchase money. In 1809, by a decree in Chancery, the sale was annulled, on the ground of fraud, and the purchase money decreed to be refunded, on condition that the plaintiff executed a release. This was

done, and he afterwards, in 1814, levied an execution founded on that decree, on lands which *Sherwood* owned in 1794, but which he had conveyed to his son in 1798, in consideration of natural affection only, and which lands the son had, in 1802, conveyed to the defendant, with knowledge of the deed to the son. It was proved, that when *Sherwood* executed the deed of gift, he was not indebted to any person, except to the plaintiff, in the manner stated, and that the lands conveyed did not contain more than one-eighth part of his real estate. But it was admitted, that long before the levy of the execution he had conveyed all his real estate, and was, at that time, destitute of property.

One question was, whether the deed to the son, being voluntary, was not fraudulent as against the plaintiff; and as the opinion of the court was on this point, I need not notice any other. It was also made a question, at the bar, whether the plaintiff was to be deemed an existing creditor at the time of the deed to the son; but as the court assumed the fact of an existing indebtedness at the time of the conveyance, I need not notice that point.

The judgment of the court was in favour of the defendant, and the opinion of eight of the judges, as delivered by the Chief Justice, was, that a distinction existed in the case of a voluntary conveyance, between the children of the grantor and strangers, and that mere indebtedness at the time, will not, in all cases, render a voluntary conveyance void as to creditors, where it is a provision for a child; that an actual or express intent to defraud need not be proved, for this would be impracticable in many instances where the conveyance ought not to be established, and it may be collected from the circumstances of the case; that if there be no fraudulent intent, and the grantor be in prosperous circumstances, unembarrassed, and not considerably indebted, and the gift a reasonable provision for the child, leaving ample funds unincumbered, for

the payment of the grantor's debts, the voluntary con-
veyance to the child will be valid against existing credi-
tors.   But if the grantor be considerably indebted and em-
barrassed, and on the eve of bankruptcy; or if the gift be
unreasonable, disproportioned to his property, and leaving
a scanty provision for his debts, the conveyance will be
void, though there be no fraudulent intent.   And it was
concluded, that under the circumstances of that case, the
indebtedness of the grantor at the time, to the plaintiff,
was not sufficient to affect the conveyance to his son.

The court do not refer to authorities in support of their
opinion, and, perhaps, they may have intended not to fol-
low, strictly, the decisions at *Westminster Hall*, under the
statute of 13 *Eliz.*   I can only say that, according to my
imperfect view of those decisions, (and by which I consi-
der myself governed,) this case was not decided in con-
formity to them; but I make this observation with great
deference to that court.   There may be loose sayings,
and mere notes of cases, from which nothing very certain
or intelligible can be deduced; but I have not been able
to find the case in which a mere voluntary conveyance to a
wife or child has been plainly and directly held good against
a creditor existing at the time.   The cases appear to me to
be upon that point uniformly in favour of the creditor.
The Vice-Chancellor, in *Holloway* v. *Millard*, says, in so
many words, that " a voluntary disposition, even in favour
of a child, is not good, if the party is indebted at the time."
The cases of *St. Amand* v. *Barbara*, *Fitzer* v. *Fitzer*,
*Taylor* v. *Jones*, and, indeed, the general language
throughout the cases, seem to me to establish this point.
So, Lord *Hardwicke* observed, in Lord *Townshend* v. *Wind-
ham*, that " he knew of no case on the 13th *Eliz.* where
a man, indebted at the time, makes a mere voluntary con-
veyance to a child, without consideration, and dies indebt-
ed, but that it shall be considered as part of his estate for
the benefit of his creditors."   In a preceding part of the

same page, he said expressly, there was " no such case," unless the conveyance was " in consideration of marriage, or other valuable consideration;" and he draws the distinction between prior and subsequent creditors, in saying, that if the voluntary conveyance of real estate, or a chattel interest, was by one not indebted at the time, and was for a child, and no particular evidence or badge of fraud as against subsequent creditors, it would be good. The decision in that case was, that a general power of appointment given over an estate, in lieu of a present interest in it, having been executed voluntarily, *though for a daughter*, was to be deemed assets in favour of creditors.

If the question rests not upon an actual fraudulent intent, (as is admitted in all the cases,) it must be a case of fraud in law, arising from the fact of a voluntary disposition of property, *while indebted ;* and the inference founded on that fact cannot depend on the particular circumstances, or greater or less degree of pecuniary embarrassment of the party. These are matters for consideration, when we are seeking, as in the case of subsequent creditors, for actual fraud. I apprehend it is, upon the whole, better and safer not to allow a party to yield to temptation, or natural impulse, by giving him the power of placing property in his family beyond the reach of existing creditors. He must be taught by the doctrines of the court, that the claims of justice are prior to those of affection. The inclination of my mind is strongly in favour of the policy and wisdom of the rule, which absolutely *disables* a man from preferring, by any arrangement whatever, and with whatever intention, by *gifts* of his property, his children to his creditors. Though hard cases may arise in which we should wish the rule to be otherwise; yet, as a permanent regulation, more good will ensue to families, and to the public at large, by a strict adherence to the rule, than by rendering it subservient to circumstances, or by

1818.

READE
v.
LIVINGSTON.

1818.

READE
v.
LIVINGSTON.

making it to depend upon a fraudulent intent, which is so difficult to ascertain, and frequently so painful to infer.

The effect of these donations, by a debtor, *inter vivos,* is much discussed by *Voet* in his *Commentaries,* on the *Digest,* lib. 39. tit. 5. *De Donationibus,* s. 20.; and he concludes, that the property in the hands of the donee is chargeable with the *existing* debts of the donor. *Ex eo autem, quod donator competentiæ gaudens beneficio deducit primo æs alienum, facilis est decisio quæstionis, utrum donatis omnibus bonis, aut majore eorum parte, donatarius ad æs alienum donatis solvendum obligatus sit?—Æquum haud foret, ex liberalitate, defuncti creditores ejus, donatione antiquiores (nam qui postea demum crediderunt, ex donatione præcedente jam perfecta videri nequeunt fraudati esse) credito suo defraudari, satiusque visum, donata revocari per actionem Paulianam, etiam a donatario in bona fide posito ac fraudis haud participe. Dum melior esse debuit conditio creditorum de damno evitando agentium, quam donatarii agentis de lucro captando.—Secundum hodierni juris simplicitatem donatarium a creditoribus donatoris recta via absque circuitu ad solvendum æs alienum donantis compelli posse, post multos alios citatos tradit Grænewegen,* ad l. 28. ff. h. t.

This learned civilian makes the same distinction that our law does, between debts existing at the time, and debts created subsequent to the gift.

The same doctrine, on this subject, in all essential respects, is adopted in *France.* The gift of *specific articles* does not charge the donee with the debts of the donor, unless the latter knew, or ought to have konwn, that he was not solvent at the time; in which case the gift is held to be fraudulent. But in other more general dispositions of the whole, or part, of his estate, the property in the hands of the donee is subject to the existing, though not to the future, debts, to the value of the gift. (*Traite des Donat.*

*enter vifs.* sect. 3. art. 1. § 2. *Oeuvres posth. de Pothier,* tom. 6.)

The question does not arise in this case, as to what extent these voluntary dispositions of property can be reached. Here the land itself exists in the hands of the trustee for the wife; and we have no concern, at present, with the question, how far gifts of chattels, of money, of choses in action, of corporate. of public stock, or of property alienated to a *bona fide* purchaser, can be affected. The debt in the present case was large, and the disposition extravagant, being of the greater part of the real estate, and we have no evidence of sufficient property left unincumbered. Even, if we were to enter into the particular circumstances of the case, I should have no doubt of the justice of the creditor's claim.

I shall, accordingly, decree, that a reference be had, to ascertain the balance of principal and interest due to the plaintiff, and that so much of the lands, included in the conveyance to *Gilbert Aspinwall*, as the Master shall judge sufficient to satisfy that amount, with costs, be sold; and that the said *G. A.* be directed to join in the conveyance, &c.

Decree accordingly.(<i>a</i>)

(*a*) In *Battersbee* v. *Farrington*, (1 *Swanton*, 106. 1 *Wilson*, 88. S. C.) decided by the Master of the Rolls, in *February*, 1818, it was considered as a point fully established, that a voluntary settlement, without fraud, by a husband not indebted, in favour of his wife and children, was good against subsequent creditors. In this case no creditor attempted to impeach the settlement, though the suit had been pending five years, nor was there any suggestion that the husband was indebted at the time of the settlement. It was farther held, that a *recital* in a post-nuptial settlement of ante-nuptial articles, was conclusive against all persons claiming under the settlement, but not evidence against creditors, without other distinct proof; because, such a doctrine would give to every trader a power of excluding his creditors, by a recital in a deed to which they are not parties. This case, which was not seen by the Chancellor, at the time his opinion was delivered confirms every branch of the doctrine contained in the above decision.