Mr. Justice Clayton
delivered the opinion of the court.
This was a bill filed in the district chancery court at Carroll-ton. It states that Trimble, the complainant, had obtained judgment against Turner for $3240, on which execution had *360 been issued, and returned no property. That defendant, Hemingway, was likewise a judgment creditor in his own right, and as executor of Samuel Bell, deceased, but that, from priority of enrolment of his judgment, he was entitled to preference over Hemingway. It further states that executions had been issued upon the two judgments of Hemingway, and had been levied on twelve slaves as the property of Turner, to which William Booth set up claim. That Booth had given bond to try the right of property to those slaves, in the circuit court of Carroll, and that the issue was still pending. It charges that the claim of Booth is fraudulent, makes Turner, Booth, and Hemingway parties, prays that the title of Booth may be set aside, and the slaves declared subject to his judgment, preferably to those of Hemingway.
Booth and Turner deny the alleged fraud. Hemingway sets up in his answer, as well as by cross-bill, that he has a deed of trust on the same property, duly recorded, and free from objection, that is, older than any of the judgments against Turner, and by virtue of which he claims priority.
The evidence shows very clearly that Turner had become wholly insolvent as early as 1843, perhaps earlier, and that as far back as 1840, one George D. McLean had recovered judgment against him for nearly $4000. A part of this judgment had been paid, but in 1843 a balance of $2600 was still due upon it. The plaintiff transferred it to the Planters’ Bank of Tennessee, and the bank constituted E. R. McLean, of Carroll county, its agent for the collection of this claim. On the 2d of Oct. 1843, the negroes in controversy were sold under this judgment, and purchased by E. R. McLean, the agent, at the price of $2000. According to his testimony, there was an agreement or understanding between Booth and himself before the sale, that he was to bid off the negroes, and Booth was to have ■ them. On the same day, Booth drew a bill in his favor on Hoopes & Marye, of New Orleans, for $2540, payable on the 4th of March following, which appears to have been the amount due on the execution. On the evening of the same day, on their way home from Carrollton, Booth told Strong that he had undertaken to befriend *361 Turner’s family, and to save the property for them; that he had drawn a bill to meet the purchase of this property, and that he expected to be able to meet the bill from the sale of Turner’s crop of cotton then growing, and from a sale of a part of the negroes. Joliffe proves that, in the winter of 1844, he bought five of the negroes from Turner, under a written authority from Booth, for which he gave $2000, and which he paid to Booth, partly in March and a part in May, 1844. In a letter from Mr. Booth, dated 10th of Oct. 1843, to Hoopes & Marye, he refers to the bill he had drawn upon them, tells them not to accept it, and “ that he gave the draft for the purchase of fifteen negroes at execution sale, in order to save something for a numerous and dependent family; that the amount is to be placed in his hands anterior to its maturity, by the friends of the family, when he is to make a bill of sale to them.” McLean states that the negroes were worth, at the time of his purchase, from $3000 to $4000, and there is abundant proof that there was no change of possession, up to the time of the last levy of the execution.
It is also in proof, that on the day of the sale to McLean, there were active exertions used by Turner, to prevent any bidding by other persons; and that, some time after the sale to Joliffe, he stated that the amount paid by Booth had been refunded to him. The sale itself was made in two lots of seven and eight respectively; not with any particular reference to families, but apparently with a view to exclude competition.
The principal question is, whether this sale was fair or fraudulent. The proof very clearly shows a combination or understanding between Turner and Booth, and Booth and McLean, before the sale under the execution. The result of that understanding was a sale at a very reduced price, virtually upon credit ; the money really either paid by Turner or refunded by him to Booth, and the property left without interruption in the possession of Turner. Did this combination hinder, delay, or defeat other creditors? To state the proposition is to answer it.
The object of the whole arrangement was to secure the property to the family of Turner, at the smallest possible price. That price was the amount of the execution under which they *362 were sold. The sale was> not made to raise cash, because the rules of law were departed from, and the sale made really upon credit. It took place at a time of the year when money is most scarce, nominally for cash, but really upon a credit to Booth, long enough to enable the crop then maturing to be carried to market and sold. It is almost demonstrably certain, that if the sale had been postponed until the bill drawn by Booth in payment fell due, the slaves would have brought double as much. For five of them were sold in the interval, for the same amount which the whole fifteen brought at the sale made by the sheriff.
The law requires a man to devote the whole of his property, with some trivial exceptions, fairly to the payment of his debts. It will not tolerate any subterfuge or device, which is intended to divert it from that purpose. The form of the contract or transaction gives it no validity, when good faith, which is necessary to the obligation of all contract's, is absent. A sale under execution confers no exemption from this principle, in behalf of those who participate in such device. Stovall v. Farmers & Merchants Bank, Memphis, 8 S. & M. 306. Whilst McLean had the undoubted right to enforce the execution of which he had the control, he had not the right so to use it as to injure others. The transaction was, in effect, an effort .to cover the title to a much larger amount of property, under the execution, than was necessary to satisfy it. No feeling of sympathy, nor any benevolence of motive upon the part of those engaged in such a transaction, can redeem it from the condemnation of the law.
The position, that a fraudulent conveyance will not be set aside in favor of subsequent creditors, even if it were granted to be true, (and about which it is not necessary to express an ’opinion,) cannot avail the defendant in this instance. Hemingway’s deed of trust is older than the sale. And if a'deed or other instrument or transaction be set aside, because of fraud as to subsisting creditors, it becomes wholly void, and cannot stand in the yray of subsequent judgment creditors. Young v. Pate 4 Yer. 164; 3 Johns. Ch. Rep. 481.
. After proof of the combination between the parties, the acts *363 or declarations of one are evidence against the others. Stovall v. Farmers & Merchants Bank, Memphis, 8 S. & M. 306.
The sale cannot be permitted to stand, and the title must be declared subject to the debts of Turner. As between the complainant, Trimble, and the defendant, Hemingway, the latter is entitled to priority of satisfaction, both in his own right and as executor of Bell. The lien of his deed of trust is prior in time to the judgment of Trimble, and consequently entitled to precedence.
It may be proper to add, that the principle which protects sales at. execution from the presumption of fraud, where the original owner is left in possession, does not apply in this case, because, as between Booth and the other parties, the contract of sale was a private one. Not much weight, however, is attached to this circumstance, because there is abundant testimony apart from any presumption.
The decree of the court below will be reversed, and the cause remanded for further proceedings, in accordance with this opinion.