## Case No. 474.

### ANONYMOUS.

[1 Wall. Jr. 107.][1]

Circuit Court, E. D. Pennsylvania.    Oct. Sessions, 1843.

BANKRUPTCY—OPINION OF COUNSEL— VOLUNTARY SETTLEMENT ON ILLEGITIMATE CHILD — RIGHTS OF CREDITORS.

1. The opinion of counsel not in practice, and given in a case other than that before the court, may, in the court's discretion, be quoted at the bar; not as authority, in a technical sense, but as calculated to assist the court in its researches and judgment. ·

2. A voluntary settlement in favour of an illegitimate child by a father in trade, and indebted, if clearly solvent at the time, is good against subsequent creditors; the settlement having been made without a fraudulent intent.

In equity.  J. S. M. being the father of an illegitimate child by a former connexion, and now about to marry another woman, settled, in March 1833, of his own suggestion, $3000, personal estate, in trust for the child; himself retaining no interest in the property, which was transferred to the trustee and the possession of it surrendered. His whole estate, in round numbers, and beyond that settled, was $13000: his debts $1700: they were simple contract debts not specially secured. His marriage took place about a month afterwards. He was in trade at the time of the settlement; about half of his estate being thus invested. He continued essentially in this relation of debts, property and business up to January 1836; rather improving his concerns than otherwise; his debts frequently shifting, and all the persons who were creditors at the time of the settlement having been paid within nine months from the date of it. In that month he entered into a partnership, and by the advice of his partner, engaged in new and extensive speculations which proved disastrous. The concern having failed in July 1838, this suit was brought by a creditor whose debt arose November 10th 1837, to set aside the settlement as fraudulent against him.

[1][Reported by John William Wallace, Esq.]

The validity of the settlement was accordingly the point in issue. In the course of the argument, the defendant's counsel, having cited judicial authorities, offered to read a printed case and opinion upon it by Mr. Binney, of the Philadelphia bar, retired from practice. He said that it appeared to be an opinion drawn with more than usual care. This was opposed on the other side as irregular, but no authorities were cited against it. His honour, remarking that such citation was not very common, desired to take till the following day to consider of it; when he gave an opinion as follows:

THE COURT. It is clear that opinions of counsel cannot be considered as of authority in any strict sense of the word: but in this day when the limits of technical precedent have been a good deal broken down, they may be used by the court, at its discretion, to assist its researches and judgment. Lord Holt. Lord Kenyon and Chief Justice Marshall, all of them men of strict minds, have severally referred to the statements of counsel made arguendo. Fisher v. Wigg, 1 Ld. Raym. 622, 631; Sadgrove v. Kirby, 6 Term R. 483, 486; Sexton v. Wheaton, 8 Wheat. [21 U. S.] 229, 243. Lord Talbot in 1734, referring to a case decided by Lord Macclesfield, mentions it as a circumstance of weight that "Mr. Vernon had always grumbled at the determination of that case, and never forgave it to Lord Macclesfield." Jones v. Marsh, Cas. t. Talb. 64. Subsequently, as appears from the Reports of Sir John Comyns, an opinion of Mr. Vernon was read before the barons of the exchequer, and appears to have been heard respectfully; since the reporter notes that the decree was "agreeable to this opinion." St. Amand v. Countess of Jersey, 1 Comyns, 255, 256. In 1790 Lord Kenyon quoted an opinion of Mr. Fazakerley and D. Ryder, and spoke of it as containing as much good law as if it had the authority of all the judges in England. Alpass v. Watkins, 8 Term R. 516, 519. The work called "Cases and Opinions" was cited more lately, both before Sir T. Plumer and Sir Lancelot Shadwell, vice chancellors, (Simpson v. Gutteridge, 1 Madd. 609, 616, or Amer. Ed. 1829, pp. 327, 330; May v. Roper, 4 Sim. 360, 362;) in the last instance by Sir Edward Sugden: and in another case, before V. C. Sir John Leach, a detached opinion of Serjeant Hill was quoted at the bar, and is given at large by the reporter, (Forth v. Duke of Norfolk, 4 Madd. 503, 504, or Amer. Ed. 1829, pp. 266, 268.) In all these instances, however, with the exception of that in Comyns, (an exception which might be excused only in favour of so great an equity lawyer as Mr. Vernon,) the opinion was given on a case other than that before the court, nor were the counsel in practice. I think that if opinions of this sort are cit-

ed, it should be under these limitations: and, of course, the reception of them at all is matter of discretion for the court. It must be intended that the court is as well instructed in the law as the majority of gentlemen at the bar. You may read the opinion;· but give a copy of it to the other side.[2]

In the argument of the principal subject, it was said, against the settlement: that sustaining it would be without any foundation in precedent. The settlement is voluntary: it is made by a person in debt: the debts are wholly unsecured either by the settlement itself, or by any lien independent of it: the settler was in trade: his bounty is in favour of a bastard child: he· himself has failed, and the party opposing it is a creditor. No case has gone so far as to support such a settlement. In Holloway v. Millard, 1 Madd. 414, or Amer. Ed. 1829, p. 225, though a mother's settlement was upheld in favour of her natural child; there was no debt, nor was the settler in trade. In Battersbee v. Farrington, 1 Swanst. 106, the settler was not in debt, and the beneficiaries of the trust were a wife and children. Sexton v. Wheaton, 8 Wheat. [21 U. S.] 229, was without debt, and in favour of a wife. And though in Stephens v. Olive, 2 Brown, Ch. 90, there were debts, ·yet it is made an important fact that they were secured by mortgage; and the settlement was in favour of a wife. Even in the case of C. F. R., on which counsel's opinion is quoted, (if such citation is to be answered,) existing debts were all secured, and the settler was neither in trade nor contemplating it. An examination of the cases subsequent to those here cited will prove, that although voluntary settlements have, at times, been sustained, they have never been settlements so surrounded with bad circumstances as this is. If the specific debts which existed at the date of this settlement, were yet unpaid, there is no doubt that the settlement could be set aside. Reade v. Livingston, 3 Johns. Ch. 481, 494. The result ought not to be altered because the debts have shifted. There has been nothing beyond shifting. Payment there has been none. Creditors may have changed, but indebtedness has remained: and it carries along with it the original taint. Suppose that the existing creditors were the same persons as were creditors at the date of the settlement; holding mere renewals of their original debts;—renewals by successive notes, perhaps. Could not such creditors set aside this settlement? The character of the beneficiary of this trust is an argument. The consideration arises ex turpi causa. It is uncleanly. To sustain it is to encourage licentiousness and, indeed, to "render adultery respectable." Throw upon every part of such vice not only the stain of disgrace, but also the sting of disability, and you do much to prevent it. The less

that is done to elevate illegitimate children to the rank of those born in wedlock, the better certainly for the cause of morals. Something was also argued from the settler's having been in trade; and reliance was had upon the remarks on this point of Judge Duncan in Thompson v. Dougherty, 12 Serg. & R. 448, 457, and of other judges in different cases; not of sufficient moment to be recorded.

BALDWIN, Circuit Justice. I was inclined, on first view, to connect this settlement with the marriage; but though we may perceive in the proximity of the two, a motive for the settlement, there is not enough in the case to prove that the transaction was in consideration of marriage. It must, therefore, be considered as a voluntary settlement; and if sustained must be sustained on the principle that it was made under circumstances which do not impair its validity when so considered. And, in the first place, I take it to be now settled, that the fact of a conveyance being voluntary is not, of itself, enough to impair its validity. Stephens v. Olive, 2 Brown, Ch. 90; Battersbee v. Farrington, 1 Swanst. 106; Sexton v. Wheaton, [supra.] Points less settled in this country are those which arise from (1) the party's having been somewhat indebted at the time; (2) his having been in trade, and (3) from the beneficiary of the trust being a bastard child.

Let these matters be examined. The whole doctrine on the subject of voluntary settlements rests, I take it, on this principle: that a man being the absolute owner of what is his own, may do with it what he pleases, provided he does not injure the existing or expected rights of others. And hence with regard to debts created subsequently to the settlement, the matter must generally resolve itself into a question of fraudulent intent: This fact or that fact is accordingly unimportant except in so far as it bears upon this question of design. The common law being a system built up as cases arise which it is to settle, its principles are developed in so close connexion with facts, that we are apt to mistake for essential that which is but accident. Thus, advancing a step beyond first principles, cases say that a settlement by one indebted is good provided there be provision in it, or otherwise, for existing debts, (Stephens v. Olive, 2 Brown, Ch. 90, 92; George v. Milbanke, 9 Ves. 194;) others rely on the fact that the settler was not in trade, (Holloway v. Millard, 1 Madd. 419, or Amer. Ed. 1829, p. 228;) others that the whole of the estate was or was not settled; others that debts were or were not contracted immediately after the settlement, (Walker v. Burrows, 1 Atk. 93;) and others upon facts of different sorts which I need not particularize. But in no case at all fully reported, (no case at least that I have been able to find,) are these facts relied on as facts, or otherwise

than as shewing the intuitus. In this point of view they are indeed often significant:— as, for example, if a man settling his estate, provide effectually for all existing creditors; the presumption of fraud on those creditors, which, without such provision, would be violent, is repelled. As, on the other hand, if, having embarked all his estate in the risks of commerce, he privately withdraw it, and yet trade as he did before, and fail; or, if he put the whole of his estae, by settlement, into the keeping of others, and so "subject himself to his cradle;" or, if, immediately after a settlement, he contract large debts with persons whom he knows to be ignorant of what he has done, and who may have been dealing and deceived by a belief of his means: in these. and in many cases which might be put, a natural or even a violent presumption of fraud arises. It is however but a presumption, and as such, liable to be overcome by facts which control and break it down.

(His honour then examined the facts of the case, as already presented, and ended in a conclusion that actual fraud could not be presumed from them.) On the contrary, the motive of the settlement seems to have been a good one. The party was father to a bastard child. In this he had undoubtedly been guilty of an act both sinful and shameful. He was about to form a new and "honourable" connexion; but his former course of living had fastened upon him obligations easy to be perceived, and permanent both on his feelings and providing care; obligations which were all the more coercive over him because they would be rejected by every one besides. What then was more decent, or more according to the suggestions of an enlightened conscience or a refined mind, than to make some arrangement by which this offspring of a strumpet's bed should not become a charge upon her whom he was about to make the wife of his bosom? There may, however, yet be some rule or principle of law which, superiour to the settler's intent, subverts his act. Thus, it is urged that the party was in debt at the time, and that the taint of this indebtedness was not destroyed by specific securities as in Stephens v. Olive, [supra.] But if you are unembarrassed by the debt, considered as an evidence of fraud, (and as such we have already considered and disposed of it,) its effect, I think, is destroyed. Mr. M. was clearly solvent in the spring of 1833: that is enough. His debts, it is true, were not secured by specific pledge; but certainly they were secured; of which the best evidence is, that they have all, long ago, been paid.

In reply to this it is argued, that although creditors have changed, indebtedness has remained; an argument which, in connexion with the facts of the present case, is rather specious than solid. Suppose, that just before the settlement, and with a view to it, Mr. M. had run off $1700 of his property, and with the proceeds paid those debts which he then owed, or that he had transferred the property itself in satisfaction of those debts: it will be admitted that, on this score of indebtedness, the settlement would be free from objection. Yet he would only have credited one account by debiting another; discharging debts, but reducing assets in exactly the same amount. He might have gone into debt again, in the same hour in which he made the settlement; purchasing or taking back the same property, perhaps; and, may be, from the same person to whom he had transferred it, and for the same price, and the identical moneys. A matter so purely formal as this would be, a mere transposition of items in account, cannot be important in itself; nor important at all, except as evidence of fraud; a point of view in which we are not, here, considering it. Solvency, it must therefore be, which is of the essence of the inquiry, and so are the authorities. Lush v. Wilkinson, 5 Ves. 384, 387; Jacks v. Tunno, 3 Desaus. 1, 5; Salmon v. Bennett, 1 Conn. 525, 548; Sexton v. Wheaton, [supra;] Hopkirk v. Randolph, [Case No. 6,698;] Van Wyck v. Seward, 6 Paige, 62, 68; and see, also, Huston v. Cantril, 11 Leigh, 136, 159.

The argument derived from publick morals, savours too much of severity. Would it not force us to avoid the contracts of these unfortunate persons? to place them under every disability? and to reduce them at once to the state of the ancient excommunicate? All their senses have but human conditions; and it is enough to leave upon them that stain of their birth, which neither their own innocence, nor a life of virtue, nor the compassion of society, nor any earthly law hath power to take away. Indeed, it would be quite as much against publick policy, in one way, to relieve a man against acts done according to his duty, as, in another way, it can be against that policy to sustain them. And a consciencious chancellor,[3] in over-ruling the hard decree of one of his predecessors,[4] said properly enough, that it is both reason and justice that a father provide for an innocent child, whom he has occasioned to be brought into the world in this shameful manner. Marchioness of Annandale v. Harris, 2 P. Wms. 432, 433. This sentiment is confirmed by other judges: "God forbid," said Chancellor Desaussure, "that I should lend the sanction of the court to any thing which would shake or loosen those great moral ties which bind society together; but we must not permit our feelings and apprehensions to mislead our judgment. Although it is morally as well as legally improper to have illegitimate children, the law not only permits, but enjoins it on the father to maintain the illegitimate child: the immorality is in the act, not in the provision." Harten v.

---

[3] Sir Peter King.
[4] Lord Cowper, Fursaker v. Robinson, Prec. Ch. 475.

Gibson, 4 Desaus. 139, 142. And see Williamson v. Codrington, 1 Ves. Sr. 511, 514; Holloway v. Millard, 1 Madd. 414, 419, or Amer. Ed. 1829, pp. 225, 227; Knye v. Moore, 1 Sim. & S. 61, 64; Bunn v. Winthrop, 1 Johns. Ch. 329, 338; also, Pratt v. Flamer, 5 Har. & J. 10, 20; and 4 Kent, Comm. pp. 216, 217.

Finally, as to the settler's being in trade. Why shall this fact, as of any essential and inherent malignity, destroy the settlement? As proving a liableness to failure, and thence as indicating a intent or inferring fraud, the force of such a fact is sometimes considerable: but the question of fraudulent intent has been disposed of. No doubt at all, these settlements are made to guard against failure;—failure, not as certain, nor as expected, nor even as probable; but yet as within the chances of human life. And, such being the fact, there seems to be no good reason why such arrangements, if allowable to those who do not require them, should be disallowed if made by persons who, from the vicissitudes of their profession, peculiarly need them. No settlement has been upturned purely because the person making it was in trade: and there are cases which have been sustained where the settler was either in trade or contemplated it. Sexton v. Wheaton, [supra;] Battersbee v. Farrington, 1 Swanst. 106, 110; Jacks v. Tunno, 3 Desaus. 1. Arguments are occasionally found against these settlements altogether, (Atherly's Treatise, pp. 230, 237;) and it is sometimes said that they are at variance with our republican manners and institutions. But I doubt whether these arguments have been well considered, or whether they would be confirmed by practical observation. If made in rightful subordination to the claims of others, at a proper time, with due reference to the amount of property unsettled, and, generally, under circumstances otherwise allowable, I confess myself unable to perceive how such settlements shall war against either our social interests or our republican manners. We have, it is true, no titled aristocracy, "and property does not, as in the land of our forefathers, accumulate in large masses, and descend undivided through a long line of expectant proprietors." But are we not endowed, like the people of other lands, with an appreciation of domestick stability and repose? with feelings of attachment to the order and comfort of families? And what is there inconsistent with the national duties of the merchant, if, in view of the vicissitudes of his profession, and in sight of the prolifick materials for their activity and influence in the game of hazard every where playing in modern commerce, he shall, prior to engaging in these risks, make some provision by which they whom he has made helpless dependants upon him, shall not be brought into inevitable subjection to his disasters? some provision by which the peace, comfort, and habits, and settled pursuits of others shall not be all torn up, as by a whirlwind, from their base? The court would justify no career of ambitious splendour, nor contend for security to luxurious enjoyments or to vulgar magnificence. Far from it: and these, indeed, belong much less to settled sources of income than to the uncertain, more varying, less valued returns of adventuring enterprize. Family settlements, such as I have spoken of, have had a place in every nation advanced at all beyond primitive civilization; and cases in our highest court and in different states of the Union, have already placed their lawfulness, with us, beyond further question. The settlement, we think, having been made without a fraudulent intent, and by a person solvent at the time, is good against subsequent creditors, though it was made in favour of a bastard child and by a person in trade.

NOTE, [from original report.] The case and opinion referred to above are as follows:

On the 18th April, 1834, C. F. R. made a conveyance of all his real estate, to certain trustees, with power to let and demise the same, and to receive the rents, issues, profits and incomes thereof, and with the same to pay, in the first place, the taxes, ground rents, and all reasonable costs and charges, &c.; and further, from time to time, to pay over the surplus income, to him, the said C. F. R. on his own receipt, and in their discretion to pay and apply the same towards his maintenance and support, for and during the term of his natural life; but in such a way or manner, that the same should not be answerable for, or in any manner liable to the debts and engagements of the said C. F. R. contracted after the date of the execution of the said deed, nor be liable to any charges, incumbrance, assignment, or anticipation of him, the said C. F. R. and that from and after his decease, the trustees should hold all the trust estate in trust, to and for the only use and behoof of six certain natural children of the said C. F. R. And it was provided further, by the deed, that it might be lawful for the trustees, to sell all the trust estate, at public or private sale, or the whole or any part thereof on ground rent, and to pay out of the proceeds thereof, all and singular the debts owing and due by the said C. F. R. at the date of the execution of the deed; and to invest the surplus in good real security: with certain other provisos, &c. The deed was recorded in the usual way, April 21st, 1834. C. F. R. died Oct. 3d, 1836. After his decease, claims were made, and judgments obtained against his estate, and in July, 1837, a bill in equity was filed in the common pleas, &c. At the time of the deed of trust, the grantor was considerably indebted, and his assignees sold a considerable part of the assigned estate in 1834,–5,–6, and paid all the debts which were known, certainly, to be within the trust. The property sold, brought more than $39,000, and the debts paid exceeded $23,000. The balance was invested in different ways, and will be applied to any remaining debts, provided for by the trust. The debts of the grantor not paid, amount, the doubtful together with the debts not to be disputed, to a sum of $17,000 and upwards. They were contracted principally in the years 1835 and 1836, and very few of them, none to a considerable amount, in the year 1834. His debts were generally of small amount, contracted in the heedless way which was his practice. He was never in trade.

Is the deed fraudulent and void as to subsequent creditors? The bill, which set forth the deed, relied principally on the fact of debts at the time and afterwards, and of the children be-

ing illegitimate. It averred that C. F. R. left sufficient real and personal estate to pay the judgment which was the subject of the bill; that the real estate had been transferred in the way before stated; and that the personal estate had been removed and transferred without consideration, or concealed, and that by reason of such concealment, and such fraudulent transfer, the complainant was prevented from having execution of his judgment.

## Opinion.

I have examined the deed referred to in the annexed case, and have considered the question submitted to me. The consideration of the deed 18th April 1834, was certainly not a valuable one. The deed was of that description which the law terms voluntary; and the question is, was it also fraudulent and void. So far as the object was to provide for natural children, the consideration was a moral one, because it was according to the grantor's duty: and although, in many respects, this class of children is not regarded by courts of law and equity with as much favour as children born in wedlock, I am not aware that any authoritative decision has attributed a greater degree of strength to a voluntary settlement for the protection of the latter than to a like settlement for the protection of the former. A voluntary settlement in favour of an illegitimate child has been sustained against subsequent creditors, the settler not being indebted at the time. Holloway v. Millard, 1 Madd. 414, Amer. Ed. Phil. 1829, p. 225. So a voluntary provision for natural children, has been inforced against the father's assets; he having defeated the settlement by a sale to a purchaser, for a valuable consideration. Williamson v. Codrington, 1 Ves. Sr. 511. Atherly, in his treatise on Marriage Settlements, argues with great force against the existence of any distinction between a voluntary settlement in favour of a child and one in favour of a stranger. Ath. Mar. Sett. 223, I think it free from doubt that the circumstance of Mr. R——'s deed being in favour of his natural children, is not a circumstance which injures it. It is of equal validity as if it had been made under like circumstances in favour of lawful children. In either case the settlement would be a voluntary settlement, liable to all the objections to which such settlements are subject, and not more or less subject to them, the one than the other. I take it to be clearly settled at the present day, that a volunteer deed in favour of natural children, may be good against subsequent creditors if the grantor was not indebted at the time: that is to say, it is not in such a case fraudulent and void against subsequent creditors, by mere presumption of law, from its being voluntary; as is the case with such settlements if the grantor is indebted at the time. There must be, to make them void, some other evidence of fraud besides the mere fact of their being voluntary and there being subsequent debts. This is the doctrine to be collected from the modern cases. Battersbee v. Farrington, 1 Swanst. 106; Sexton v. Wheaton, 8 Wheat. [21 U. S.] 229; Hinde v. Longworth, 11 Wheat. [24 U. S.] 199; Reade v. Livingston. 3 Johns. Ch. 481; Thompson v. Dougherty, 12 Serg. & R. 448. I regard it also as settled, that if the grantor is indebted at the time, but his debts are already secured or provided for by the settlement, then the presumption of fraud from the party's being indebted at the time, is repelled by these facts; and, unless there is other proof of fraudulent intention in regard to subsequent creditors. the deed is good against them. Reade v. Livingston, 3 Johns. Ch. 481; Stephens v. Olive, 2 Brown, Ch. 90; Lush v. Wilkinson, 5 Ves. 384. In George v. Milbanke, 9 Ves. 194, Lord Eldon says, the modern doctrine is, that a provision in a voluntary settlement, for existing debts, will support it against all future creditors. I understand this to mean, not that in such a

case, no circumstance of intentional fraud upon subsequent creditors will weigh against the settlement, but that the presumption of fraud from being indebted at the time, is effectually repelled by the provision, and therefore that the settlement is as valid as if he had not been indebted at the time. In such a case, the question whether the deed be fraudulent against subsequent creditors depends upon other circumstances shewing a fraudulent intention at the time.

The circumstances shewing fraudulent intention whereby a voluntary deed by one who is not indebted at the time or has made provision for existing debts is nevertheless void against subsequent creditors, are stated to be of the following kind:—as the continuance of the grantor in possession; an unusual degree of secrecy in making the settlement; the reservation of a general power of revocation; and the like. It has been said in Fonblanque, 270, note a, that if a voluntary settlement includes the whole or the greater part of the grantor's property, this is a circumstance of fraud which will overthrow it; because the grantor must have foreseen that future creditors would suffer by it: and Judge Duncan, in Thompson v. Dougherty, [supra,] seems to have entertained this opinion. But I can find no other authority for this opinion; and if in the last case, his honour thought that Lord Northington's language in Partridge v. Gopp, Amb. 599, was an authority for it, it was, I apprehend, a clear mistake; for Partridge v. Gopp was a case of existing debts at the time of the advance to the children, and the language of the chancellor is to be applied to such a case. If the quantity of the grantor's property not conveyed is insufficient to pay all subsequent debts, it may in like manner be argued, that he must have foreseen that future creditors would suffer by it: and what is this but to say, that a voluntary conveyance is not good where enough is not reserved to pay all subsequent debts? or, in other words, that no such conveyance is good against such creditors? The circumstance which makes the amount of property conveyed material, would seem to be, the clear and certain intention to contract debts afterwards, and to leave them unprotected. This comes under another head to which I will advert; but in the absence of any such foregone purpose to contract debts, I am unable to perceive any objection against a conveyance of all the grantor's property which does not equally hold against the conveyance of any part of it. Among the circumstances inferring a fraud intended upon subsequent creditors, Lord Hardwicke, in Walker v. Burrows, 1 Atk. 94, has also stated, the becoming indebted immediately after the settlement. There certainly may be cases in which debts immediately following a settlement, might speak very strongly as to the intention with which it was made: but debts of small amount, debts of weakness and heedlessness, rather than of design, might immediately follow and yet infer no such previous intention. It remains, I think. to be considered by our courts, how far the universal recording of conveyances of land under our law, ought to affect this question. It is true, that recorded or not, a deed of conveyance may disappoint a creditor; but if in fact recorded, it may perhaps be thought in no slight degree to repel the presumption of intended fraud upon subsequent creditors. I cannot find that Lord Hardwicke's dictum has been acted upon, unless in the case of persons in trade, intending to go on contracting debts in trade, as in Thompson v. Dougherty. The circumstance is not perhaps very material in the present case.

To apply these principles to the deed of Mr. R——. Mr. R—— was indebted at the execution of the deed, and perhaps largely so. Had there been no provision for these debts. the deed would have been by force of the statute, and upon general principles of law, fraudulent

and void against creditors subsequent as well as antecedent; for a voluntary deed, fraudulent and void against existing creditors, is so against subsequent creditors. But the deed does make a provision for all existing debts. It gives the trustees a power to sell, and declares the trust as to the proceeds of sale, for the satisfaction of all these debts in the first instance. It was therefore not fraudulent and void against existing creditors, and consequently if it is void against subsequent creditors, it is not so by necessary presumption of law, but in consequence of other circumstances. It is true, that previous to the power of sale in the deed, there is a power given to the trustees to let and demise the property and to pay over the nett rents to the grantor during his life, or to apply them for his maintenance in such a way that they should not be answerable for his debts subsequently contracted; and no express trust is declared as to these rents to apply them to the payment of his existing debts. But it is clear that there is no trust to apply them in defeat of existing debts, but only of subsequent debts; and taking the whole deed together, I am of opinion, that the duty of the trustees is to see to the satisfaction of existing debts in the first instance. By the acceptance of the trust, the grantees became trustees for these creditors, and were bound to exercise the power of sale for their satisfaction. The power of sale rides over the trust for the application of these rents. What they had power to do for these creditors it was their duty to do, and to do it immediately if this was necessary. I therefore regard the true interpretation of the deed to be, that the trust as to the rents is subject to the power for the benefit of the creditors; and that a payment of the rents to the grantor, if it impaired the security of existing debts, would have been a breach of the trust to sell: for the power was a trust, and of paramount obligation according to the clear intention of the deed. I am therefore of opinion that the deed makes a clear provision for the satisfaction of all existing debts; and the case shews that the trustees have sold parts of the estate, and have paid all debts that were known to be of this description. The presumption of fraud from the existence of these debts, is therefore repelled, and consequently, according to the cases I have cited, the deed is good against subsequent creditors unless there are circumstances shewing an actual intention in the grantor to defraud such creditors. Upon examining the papers, and the bill that has been filed in the common pleas, I perceive no evidence or allegation of such circumstances: The bill relies on the fact of debts at the time and afterwards. But the debts at the time were provided for and if subsequent debts are enough per se, no voluntary settlement can be good against subsequent creditors. It dwells also upon the circumstance that the principal objects of the trust were illegitimate children; but this, the cases adverted to shew, is not unlawful, but as good as if the objects were lawful children. By setting forth the whole deed, the bill necessarily sets forth the trust to the grantor for life, though it does not specifically notice it as a badge of fraud. The question in regard to such a trust is of great moment. If it is void then a man cannot protect himself against his own weakness. He may grant to his family, to a stranger, to any volunteer whatever, but he cannot grant for his own maintenance, so as to exclude his subsequent creditors, nor vest in his trustees a power to supply him in their discretion, so as to make his maintenance certain. I am not aware of any decision to sustain such an objection. The power of the owner of an estate so to settle it as to tie his own hands as to the time, manner and circumstances of his own disposition of it, is not to be denied since the case of Bath v. Montague, 3 Ch. Cas. 107–108. Lord Holt argued that there might be very good reasons for even a wise man to put such restraints upon himself to guard against rash and precipitate wills, settlements or gifts, to prevent inconveniences that might arise from an infirmity on his part, and that no court of equity, any more than of law, could relieve him from the restraints so deliberately imposed upon himself. The same is equally true as to voluntary settlements, providing for the certain maintenance of the grantor. They may be fraudulent against subsequent creditors for other causes: but are they so, because, instead of declaring an immediate trust for children, they declare a trust for the grantor himself during his life? I confess I do not perceive why they should be so, nor why, if the estate may go to a volunteer or stranger, so as to elude a subsequent creditor, it may not also go to the settler himself in such a way as to prevent creditors reaching it. Such a trust may, in connection with others, tend to raise a presumption of fraud; but by itself, I do not think it has ever been so held. The point yet remains to be settled. In like manner, the bill, by setting forth the whole deed. shews that it conveyed all the grantor's real estate: but it does not point it out as a specific objection. On the contrary, it alleges that which is adverse to the objection and might be fatal to it, namely, that the grantor had personal property also, which he left at his decease, but which had been removed or transferred without consideration, or concealed:—matters not charged nor chargeable upon the deed of April 1834, or the trustees. This objection, if made, ought, I think, to be over-ruled. As regards the grantor's becoming indebted immediately after the deed, and thus shewing a fraudulent intent, the case states the contrary. The great mass of subsequent debts does not shew fraud intended by the conveyance, so much as it shews a continuance of the weakness against which, as possible, though not as intended, he wished to guard his children and also himself. He was never in trade. He did not mean to go into trade. They were in general, debts of folly, committed upon a sudden temptation: not the result of previous purpose or design. There was no concealment. The deed was executed on the 18th of April, and recorded in Philadelphia on the 21st of the same month; and it contains no power of revocation, nor is there any evidence or allegation that the grantor continued in possession or in the exercise of any control or management of the property. My opinion upon the whole is, that the deed may be sustained against the subsequent creditors: not being fraudulent and void against them, though voluntary.    HOR. BINNEY.

Philadelphia, Oct. 10, 1838.