Hagerman v. Buchanan.

JOHN H. HAGERMAN and SARAH HAGERMAN, appellants,

*v.*

NELSON E. BUCHANAN, GARRET V. SMOCK and GEORGE SMOCK, partners trading as N. E. Buchanan & Co., respondents.

When a creditor, who became such subsequently to the execution of a voluntary conveyance made by his debtor, attacks the conveyance as void by the operation of the statute of frauds and perjuries, the burden is upon him of showing that an actual intent existed in the minds of the parties to the conveyance, at the time of its execution, to hinder and delay creditors.

On appeal from a decree advised by *Wm. S. Gummere, Esq.,* advisory master, who filed the following conclusions:

The complainants are judgment creditors of the defendant, John H. Hagerman, and have exhibited their bill to set aside two conveyances made for the purpose of transferring the title to certain lands at Asbury Park from said Hagerman to his wife, the defendant, Sarah Hagerman. The ground upon which the complainants base their right to the relief sought is, that the conveyances were made without consideration and in fraud of

Hagerman v. Buchanan.

creditors. The bill, however, shows that the conveyances were made on the 17th day of July, 1883, while the debt upon which the complainants' judgment is founded was not incurred until more than three years later; so that, even if the conveyances were voluntary, the complainants are not entitled to a decree setting them aside, unless actual fraud has been shown.

The testimony in the cause shows that, upon the same day on which the conveyances in question were made, the defendant, John H. Hagerman, became a partner in a firm whose debts and liabilities at that time amounted to from $15,000 to $20,000, and that as such partner he became personally liable to pay the same. It further appears that within about three months after entering into said partnership, the firm failed for a large amount of money, which still remains unpaid.

After a careful examination of all the evidence in the case, I am led to the conclusion that John H. Hagerman transferred the title to the lands in question to his wife in view of future indebtedness, and with the intent to place it beyond the reach of his creditors in case the business in which he was about to embark should prove unsuccessful, and that such action on his part was a fraud upon those creditors to whom he became indebted subsequent to the transfer of the property to his wife. That transfer, however, was not without consideration. The evidence shows, that in 1876 the defendant, John H. Hagerman, borrowed from his wife $2,400, to secure the payment of which sum, together with the interest which had accrued thereon, he, on the 6th day of December, 1879, gave her a mortgage upon the Asbury Park property; and that subsequently she paid off another mortgage which was upon the property, amounting to $600, with her own funds, upon the understanding that the amount should be repaid to her by her husband. It also appears that, from time to time, prior to making the transfer in question, she expended moneys in repairs to the said property. Both the husband and wife swear that the transfer of the title was made to the wife for the purpose of satisfying this indebtedness, and although I think it clear from the proofs that the husband, when he made the conveyance, did so in fraud of creditors,

yet the evidence does not satisfy me that the wife was a party to the fraud or cognizant of her husband's intention, the case against her upon this point being, in my judgment, merely one of suspicion. The complainants, therefore, are not entitled to a decree declaring the conveyances absolutely void as made in fraud of creditors, for to justify the court in completely annulling a deed made to a grantee who is a creditor, or who has paid value therefor, it must not only be shown that the grantor made the conveyance for the purpose of defrauding creditors, but also that the grantee participated in the fraudulent intent of the grantor.

But although the transfer from the husband to the wife was not without consideration, yet, in my opinion, the testimony in the case shows that the consideration was an inadequate one. It clearly appears that the value of the property at the time of its transfer was between $4,500 and $5,000, while the amount of the husband's indebtedness to his wife was much less. The husband says that it amounted to a little more than $4,000, while the wife is unable to say how much it amounted to. I think, however, that the amount as stated by the husband is excessive. It is made up of the $2,400 above referred to, with interest thereon, the mortgage of $600 which was paid by the wife, and also certain moneys (the amount of which he does not state) paid by the wife in painting, papering &c. the house.

It is true that if interest upon the $2,400 from the time when it was loaned and upon the $600 from the time when the mortgage was paid off be added to the principal of the moneys which the wife either loaned to the husband or paid for him, it would swell the total to about the sum named by the husband as the amount of his indebtedness to his wife; but if the wife was entitled to interest on the money loaned by her up to the time when the title was transferred to her, and also for moneys expended by her in repairs &c., then she should be charged for the use and occupation of the premises, for the testimony shows that for several years prior to the transfer to her she carried on the business of a boarding-house there, and appropriated the proceeds of that business to her own use. In my opinion, the amount of the hus-

band's indebtedness to the wife will be found upon an accounting to be under, rather than over, the $4,000.

After a careful consideration of all the testimony, I have reached the conclusion that this case is one for the application of the principle adopted in *Demarest* v. *Terhune, 3 C. E. Gr. 532,* that, where a deed is sought to be set aside as made in fraud of creditors, and the evidence, although insufficient to justify the court in completely annulling the deed, nevertheless discloses that the consideration for the conveyance was inadequate and raises up grave doubts as to the fairness of the transaction, the court will permit the conveyance to stand only as security for the consideration actually paid. I think that the complainants are entitled to have the conveyances decreed to stand only as security for the amount actually due to the defendant, Sarah Hagerman, from her husband; and that there should be a reference to ascertain how much is so due upon an accounting between the parties, and that said amount should be declared to be a first lien on the said premises; and further, that one of the masters of this court should be directed to sell the said premises at public sale, and that the proceeds thereof should be applied, first, in payment of the amount found to be due to the said Sarah Hagerman, and, secondly, in payment of the judgment of the complainants, together with their costs of this suit.

I will advise a decree in conformity to these views.

*Mr. Samuel A. Patterson* and *Mr. Henry G. Clayton,* for the appellants.

*Messrs. Hawkins & Durand,* for the respondents.

The opinion of the court was delivered by

Reed, J.

The complainants below furnished lumber to J. H. Hagerman & Son between the dates of July 24th, 1886, and November 29th, 1886. On March 4th, 1887, a judgment was recovered in the supreme court for the sum of $958.53, the price of said lum-

ber.  Under a *fi. fa.* issued thereon, a certain house and lot in
Asbury Park was levied upon.  The title to this property stood
in the name of Sarah Hagerman, the wife of the defendant, John
H. Hagerman.  It was conveyed to her by her husband, through
an intermediate person, on July 17th, 1883.  The bill in this
case was filed by Buchanan & Co., the judgment creditors, for
the purpose of having the conveyance made by Hagerman to his
wife declared void, upon the ground that it was made to hinder
and delay creditors, and to have the property sold and the pro-
ceeds applied to the payment of their judgment.  The court be-
low advised that the case stood in the same posture as that of
*Demorest* v. *Terhune, 3 C. E. Gr. 532,* and that the rule adopted
in that case was properly applicable to this.  A decree was
accordingly made that the deed made by Hagerman to his wife
should be regarded only as a security for the consideration
actually paid by her.

It is perceived that the debt of the complainant was contracted
over three years after the conveyance was made which is attacked.
If the conveyance is to be regarded as in a degree voluntary, the
creditor has a burden imposed upon him which would not exist
had his debt antedated the deed.  The character of a voluntary
conveyance, when attacked by a creditor having a pre-existing
claim, is definitely settled in this court.  In the case of *Haston* v.
*Castner, 4 Stew. Eq. 697,* after an elaborate review of the course
of judicial sentiment in this State, it was decided that, in respect
to debts existing at the date of a voluntary conveyance, the deed
was void by force of the statute relating to frauds and perjuries.
Against the attack of a creditor belonging to this class, neither
the motive which induced the deed, nor the solvency of the
grantor at the time of its execution, nor any other circumstance
which might bear upon the *bona fides* of the parties to the con-
veyance, is important.  Fraud is the legal conclusion arising
from the contemporaneous concurrence of the two facts, namely,
a voluntary deed and an existing debt due by the grantor.

In respect to the attitude which subsequent creditors bear
towards a voluntary conveyance, there has not been, so far as I
recall, a deliverance by this court.  But the sentiment, both

judicial and professional, is hardly less doubtful upon this than upon the former question. The rule which has been recognized is, that a voluntary settlement can be attacked by a subsequent creditor only upon the ground of the existence of an actual intent in the mind of the parties at the time of the execution of the conveyance to hinder, delay or defraud creditors by means of the deed. In the case of *Ridgway* v. *Underwood, 4 Wash. C. C. 129,* Judge Washington, after stating that he had examined the numerous cases which related to the operation of the statute (*13 Eliz.*), remarked, that, with entire satisfaction to himself, he had reached the following result: "A voluntary deed by a person indebted at the time to any amount is fraudulent and void as to such prior creditors, merely upon the ground that he was so indebted. But as to subsequent creditors the deed is not void for that reason, because it does not necessarily or even rationally follow that the conveyance was fraudulently made with intent to hinder or delay creditors who became such long after the deed was made. But if the case presents other circumstances from which fraud can legally be inferred, the voluntary conveyance will be avoided in favor of a subsequent creditor." This case was cited with approval by Chancellor Green in his opinion in the case of *Beeckman* v. *Montgomery, 1 McCart. 106.*

In the case of *Reade* v. *Livingston, 3 Johns. Ch. 481,* Chancellor Kent, after an elaborate view of the authorities, came to the conclusion, also, that in respect to pre-existing creditors, a voluntary conveyance was fraudulent as a legal inference, and ought to be so far as it concerned existing debts, but that as to subsequent debts there was no such necessary legal presumption, and there must be proof of fraud in fact. Indebtedness existing at the time, although not amounting to insolvency, must be such as to warrant that conclusion. The view of the learned chancellor was that, while fraud would be imputed to the voluntary grantor so far as the grant affected pre-existing debts, yet that the fact of the existence of such debts, and their relative amount in comparison with the property of the grantor remaining, were, as to debts subsequently arising, only facts which were important in determining whether there was an actual intent at the time of

the conveyance to hinder and delay creditors. The doctrine of this case, so far as it dealt with the attitude of a voluntary grantor toward prior creditors, was adopted by this court in the case of *Haston* v. *Castner, 4 Stew. Eq. 697*.

The opinion in the former case was also noticed in the opinion in *Haston* v. *Castner*, as one delivered by a distinguished judge upon a review of all the decisions then extant, and as one which had largely shaped the jurisprudence of this country upon this branch of equity jurisprudence. While it is true that the court was not dealing with the feature now under consideration, yet the distinction between the *status* of the two classes of creditors was a conspicuous feature in the opinion of Chancellor Kent. It promulgated a doctrine which embraced within its scope all creditors. The approval of the opinion of Chancellor Kent went far in the direction of an endorsement of his whole declaration, which constitutes a single and complete system touching the doctrine of voluntary settlements in respect to creditors of all kinds.

By reason of these recognitions of cases in which the distinction above mentioned has been formulated, and by reason of the rational grounds upon which such a distinction rests, I regard the complainant in this case as having the burden of showing that, at the time the conveyance was made, there existed an actual intent to hinder and delay creditors. This conclusion appears the more reasonable after an examination of the cases in the English courts dealing with this subject. From such an examination it appears that, while there has been considerable fluctuation in judicial sentiment in respect to the attitude of prior creditors who attack a voluntary conveyance, there is little or none in respect to the posture of subsequent creditors. As to the latter of the two classes of creditors, the rule has been quite uniform, that an actual fraudulent intent to defraud some creditor must be proved.

In an attack upon such a conveyance by a subsequent creditor it is true that the fact that there were pre-existing debts has always been considered more or less important in determining the existence of a fraudulent intent. Different equity judges have

accorded to the existence of such debts different degrees of probative force, and have raised from the fact of their existence certain indisputable presumptions, but the line of adjudications is opposed to the notion that the existence of a prior debt of any amount raises a conclusive presumption that a voluntary conveyance is fraudulent as against the attack of a subsequent creditor. *May Fraud. Con. 64.*

The rule laid down by Chancellor Kent and Judge Washington is not only simple, but equitable.

A conclusive presumption against a voluntary conveyance should be raised in respect to those debts which it may be presumed were incurred upon the faith of the ownership of the property conveyed.

It is therefore inequitable that the debtor should be permitted to give away such property at the expense of a pre-existing creditor, whether the intention be good or otherwise. But as to creditors who become such without any possible inducement arising from such ownership, no such conclusive presumption should arise. No equitable consideration requires it; and, besides, if such a rule be adopted, no settlement could be made which would not be at the mercy of the grantor during his lifetime. The power to incur debts would be a power to subject the property to a liability for their payment at any time. So, as already remarked, equitable considerations, as well as the weight of authority, are in favor of the rule that an actual intent to defraud, arising from all the circumstances surrounding the transaction, must be proved before a voluntary conveyance will be decreed void at the suit of a subsequent creditor.

An observation seems appropriate in respect to the legal terms which are employed in dealing with these two classes of cases. Void voluntary conveyances, when spoken of in respect to either class of creditors, are styled fraudulent, but as to the former class there is said to be legal fraud, and as to the latter class actual fraud.

There is force in the remark of Mr. Bigelow, that the term "legal fraud" is a misnomer. The word "fraud" implies moral turpitude. When a transaction is voided by the statute

without respect to the motive which induced it, but upon considerations of policy only, it is unlawful and not fraudulent. To style it fraudulent, whether the fraud be legal or otherwise, may fix an unmerited stigma upon the party to the transaction. A more just and appropriate appellation to apply to conveyances of the former class would be simply unlawful, while the term "fraudulent" would still properly be applicable to the latter class of conveyances.

The question of fact remains to be considered, whether there was an intention existing in the mind of the parties to the present conveyance to hinder and delay creditors, which induced the execution of the deed. In the first place, the facts proved show that that conveyance was voluntary only in respect to a slight proportion of the value of the property sold. The wife, at the time of the conveyance, was a creditor of her husband. According to the testimony, the lot sold was worth about $2,000. Mr. Hagerman says the house, outhouses, barns and fences cost $2,500. The whole property was worth from $4,500 to $5,000.

The claims of the wife against her husband were the following: She had owned property in Brooklyn before she and her husband removed thence to Asbury Park. In 1876, she sold this property, upon which there was a mortgage for $5,000, for the sum of $7,400. The balance, amounting to $2,400, she loaned to her husband. He gave her a mortgage to secure this loan, with the interest thereon, amounting together to the sum of $2,814. There was upon this property, upon which the mortgage was given, another mortgage of $600, which mortgage she paid from the proceeds of some building and loan association stock which she owned. If interest be allowed her on her mortgage from December 6th, 1879, to July 17th, 1883, it would amount to $610 more. There is nothing in the case to show that she should not be entitled to interest, as would any other mortgagee.

It is true she lived in the house, but, nevertheless, it was the home of her husband, and it was her home because it was his home. She cannot be regarded as a mortgagee in possession.

Hagerman v. Buchanan.

The husband owned the legal title and was himself in possession of the property.

Nor does the fact that she took in boarders and received compensation therefor change this condition of affairs. She says that she expended the money so received in the care and reparation of the property. But if this be not so, it would not affect the position of the husband as the head of the family in possession, for if she took the proceeds of the boarders it was the proceeds of her own labor, which the husband had the right to permit her to appropriate. *Peterson* v. *Mulford, 7 Vr. 481; Luse* v. *Jones, 10 Vr. 707.*

Indeed, the reception of boarders seems to have been a mere incident of the housekeeping, and in no way diminished the value of the use of the property to Mr. Hagerman, but probably diminished the housekeeping expenses which would otherwise have fallen legally upon him. So I regard the amount of the indebtedness of the husband to the wife as reaching to the sum of $4,000.

I place the value of the house from $4,500 to $5,000, and I doubt if it would have brought more than the latter sum in the market. So, the difference between the wife's claim and the value of the property which she received is not great.

But there is another fact which still further reduces the amount of this difference: the wife had her inchoate right of dower in the property, the value of which, of course, could not be applied to the payment of her husband's creditors. The fact of this encumbrance upon the property, in some degree, diminishes its salable value. So, I think it appears true, as I have already remarked, that the voluntary element in this transaction is small relative to the entire value of the property, and this is a material feature in solving the question whether the conveyance was fraudulent.

The point strongly insisted upon by the counsel for the complainants was, that it appeared that on the day the deed was given, Mr. Hagerman entered into a partnership. He became a member of the firm of J. C. Farr & Co. He gave for his interest in the firm two promissory notes of $7,500 each, both

amounting to $15,000. It appears that this firm became insolvent in three or four months thereafter. It is argued that this shows that Mr. Hagerman was entering upon a hazardous enterprise, and that this deed was made to place his property beyond the reach of future creditors.

Now, it is true that the fact that a person has entered into a hazardous business, or engaged in a speculative enterprise, at or soon after the execution of a voluntary conveyance, is strong evidence of a fraudulent intent. It evinces a desire to reap the benefit for himself if successful, and escape responsibility if unlucky. Nevertheless, each case must stand upon its own footing, and no legal rule can be adopted as to the quantity of proof or the particular complexity of facts which will annul a conveyance upon this ground. The character of the business, the degree of pecuniary hazard incurred, the amount of property remaining in the grantor, the value of the property conveyed, the acts and words occurring coincidently with the transaction, are to be viewed together in solving the question of fraudulent intent.

Now, viewing these transactions together, I do not think such an intent has been proved. I think that Mr. Hagerman inquired, as he says he did, particularly about the business of Farr & Co., and that he tried to be careful not to involve himself in a precarious business.

I think it was only when he was convinced by the persuasions of Mr. Farr that it was entirely safe, and that the amount of his notes would be paid out of the proceeds, that he entered into the business. He says it was understood that the old firm had assets to the amount of $40,000, and that the liabilities which the new firm assumed were only $15,000 or $20,000. Although in fact the business was risky, as the result disclosed, as Hagerman understood it at the time he became connected with it, it did not so present itself. He undoubtedly wished to place his wife in a position of security, as she had frequently requested. But this is the object of every settlement. She had no security for the $600. Taking into consideration the fact that he says that he had $1,800 in bank and a lot worth $600, that the voluntary

·elements in the conveyance are so small, and that he seems to have been led to believe that the business he afterwards engaged in was entirely safe, I do not think it proved that the conveyance to his wife was induced by a fraudulent intent to hinder and delay creditors.

The decree below should be reversed.

*Decree unanimously reversed.*