ROBERT E. GARDNER and HAMILTON WEEKS, partners, trading as Gardner & Weeks, and JOHN GARDNER,

*v.*

FREDERICK KLEINKE and WILHELMINA, his wife, GUSTAV DOPSLAFF and others.

1. All that a prior or existing creditor need do to successfully impeach a voluntary deed, is to show that he was a creditor of the grantor when the deed was made, and that the deed is without the support of an adequate valuable consideration. From these two facts the law raises a conclusive presumption of fraud.

2. But a creditor, whose debt is contracted subsequent to the execution of a voluntary deed, in order to be entitled to have such deed set aside, must show actual fraud; he must show that the deed was made with intent to defraud such persons as should, subsequent to its date, become creditors of the grantor.

3. When a voluntary deed is set aside as fraudulent against prior or existing creditors, subsequent creditors are not entitled to be paid out of the money realized from the sale of the land unless they show that the deed was also fraudulent as to them.

On final hearing on bill, answers and proofs taken in open court.

*Mr. Frederick Frambach, Jr.,* for the complainants.

*Mr. Max Salinger* and *Mr. Theodore Ryerson,* for the defendants.

VAN FLEET, V. C.

The complainants are judgment creditors of Frederick Kleinke. John Gardner recovered a judgment against Kleinke, in the circuit court of the county of Hudson, on the 12th of April, 1888, for over $900, and Gardner & Weeks, on the 16th day of the same month, also recovered a judgment against him, in the same court, for over $800. The complainants, having exhausted their remedy at law, now seek the aid of this court to reach certain lands, which they allege Kleinke, with intent to defraud them, conveyed to his wife some months before they commenced their suits, but after a part of each of the debts, on which their judgments are founded, had been contracted by him. The complainants ask that a decree be made declaring three deeds to be void as to them : *First,* a deed made February 8th, 1887, by Kleinke and wife to one Boucheu ; *second,* a deed made on the same day by Boucheu to Mrs. Kleinke ; and *third,* a deed made March 14th, 1888, by Mr. and Mrs. Kleinke to Gustav Dopslaff. The two deeds first mentioned each purport to be founded on a consideration of only $1. It is undisputed that they were executed merely for the purpose of transferring the title to the lands from the husband to the wife, and that the part which Boucheu took in the transaction was not that of purchaser, but that he simply allowed himself to be used as a conduit by which the title might be carried from the husband to the wife. The deed to Dopslaff purports to be founded on a consideration of $5,000.

The proofs show, that a part of each debt, on which the two judgments are founded, had been contracted prior to the date when the title to the lands in question was changed from Mr. Kleinke to his wife, and they also show, that another and the larger part of each was contracted subsequent to that date, so that the complainants stand, with respect to the change of title from the husband to the wife, in the position of both prior and subsequent creditors. This being so, there can be no doubt, if the conveyances, by which that change was effected, were voluntary, that the complainants have a right, as prior creditors, to have them declared void. For nothing would seem to be better settled in this State than that the law will, with respect to all

sorts of voluntary alienations and transfers, raise a conclusive presumption of fraud in favor of creditors whose debts exist when they are executed. All that a creditor need do to successfully impeach such an alienation is to show that he was a creditor of the grantor when the deed was made, and that the deed is without the support of an adequate valuable consideration. From these two facts the law raises a conclusive presumption of fraud. The established doctrine on this subject was stated by Chancellor Williamson, in *Cook* v. *Johnston, 1 Beas. 51,* as follows: "If the party is indebted at the time of the voluntary settlement, it is presumed to be fraudulent in respect to such debts (that is, those antecedently due), and no circumstance will permit those debts to be affected by the settlement, and repel the legal presumption of fraud." The doctrine, as thus stated, was quoted with approbation by Chief-Justice Beasley, in delivering the opinion of the court of errors and appeals, in *Haston* v. *Castner, 4 Stew. Eq. 697, 702.* And in the subsequent case of *Hagerman* v. *Buchanan, 18 Stew. Eq. 292, 296,* Mr. Justice Reed, in pronouncing the judgment of the same court, said: "Against the attack of a creditor belonging to this class [a prior or existing creditor] neither the motive which induced the deed, nor the solvency of the grantor at the time of its execution, nor any other circumstance which might bear upon the *bona fides* of the parties to the conveyance is important. Fraud is the legal conclusion arising from the contemporaneous occurrence of the two facts, namely, a voluntary deed and an existing debt due by the grantor." The law, as thus declared, puts the right of the complainants, so far as they were creditors at the time when the deeds in question were made, to have them set aside, if they were voluntary, beyond dispute.

There are also authorities which quite distinctly declare, that if the complainants have a right, as prior creditors, to have the deeds, which they assail as fraudulent, set aside, and the lands which the deeds convey converted into money, the complainants will be entitled to be paid, out of the money realized from the lands, the whole of their debts, not merely such parts as had been contracted prior to the change of the title from the husband

to the wife, but also the parts which have been contracted since. Chancellor Kent, in the exhaustive opinion which he wrote in *Reade* v. *Livingston, 3 Johns. Ch. 481,* and which Chief-Justice Beasley stated, in his opinion in *Haston* v. *Castner,* had had much to do with the shaping of judicial opinion on this topic in this country, said (*p. 499*) : "The cases are numerous to show, that if the settlement be once set aside by prior creditors, subsequent creditors are entitled to come in and be paid out of the proceeds of the settled estate." In *1 American Leading Cases 42,* it is said :

"In equity if a conveyance is set aside by the prior creditors, as being voluntary and fraudulent as against them, the whole settled estate becomes assets, and the subsequent creditors are entitled to come in upon the proceeds."

Judge Duncan, of the supreme court of Pennsylvania, stated the law in the same way in charging the jury in *Thompson* v. *Dougherty, 12 Serg. & R. 455.* And Vice-Chancellor Knight Bruce, in *Ede* v. *Knowles, 2 Younge & Coll. C. C. 178,* said : "I apprehend that a deed can only be set aside as fraudulent against creditors, at the instance of a person who was a creditor at the time, though when it shall have been set aside, subsequent creditors may be let in." And in *Hunt on Fraudulent Conveyances 52,* it is said :

"Where a voluntary settlement is set aside as fraudulent against creditors whose debts existed at the time it was executed, the settled property becomes available for the payment of all the settlor's creditors, without regard to the time when their debts accrued."

But it is impossible, as it seems to me, to reconcile the doctrine affirmed by these authorities with the leading principle recently established by the judgment of the court of errors and appeals in the case of *Hagerman* v. *Buchanan,* already cited. That case plainly decides that a voluntary conveyance cannot be set aside, at the instance of a subsequent creditor, except that actual fraud be shown ; that is, the attacking creditor in such a case, to place himself in a position to be entitled to relief, must prove that the conveyance, which he assails, was

made and accepted with intent to defraud such persons as should, subsequent to its date, become creditors of the grantor. The principle which that case authoritatively established, so far as this court is concerned, is stated by Mr. Justice Reed, who drew up the opinion of the court, as follows: "A voluntary conveyance can be attacked by a subsequent creditor only upon the ground of the existence of an actual intent in the mind of the parties, at the time of the execution of the conveyance, to hinder, delay or defraud creditors by means of the deed." It necessarily follows that a voluntary deed may, under the rule in force in this State, be valid as to subsequent creditors, but fraudulent as to prior or existing creditors. When such a deed is set aside at the instance of prior or existing creditors, it is impossible for me to see how, according to either reason or justice, any part of the money realized from the property can be applied to the payment of the debts of creditors against whom the deed is entitled to be upheld as valid. To so apply it would, as it seems to me, be a plain violation of that principle of natural justice which deprives even the law-making power of the right to take property from one person and give it to another.

The rule, then, to be applied in deciding whether the conveyances assailed in this case are fraudulent or not, must, I think, be regarded as well settled and clearly defined. If the conveyances were voluntary, they must, as to such parts of the complainants' debts as had been contracted prior to the time when they were executed, be held to be void ; but, to warrant the court in declaring them fraudulent as to such parts of the complainants' debts as were contracted subsequent to the time when they were executed, there must be proof clearly showing that they were executed with an intent to defraud such persons as should become creditors of the grantor after their execution. The fact that the same persons happen in this case to be both prior and subsequent creditors should not, as it seems to me, alter, in the slightest degree, the rule of evidence, nor does that fact, in my judgment, constitute any reason why the complainants should be given relief in respect to their subsequent debts without proof of actual fraud, or on a less measure of proof than they would be required to make if

they were before the court simply in the character of subsequent creditors. The question whether the deeds attacked by the complainants were made and accepted with intent to defraud future creditors, is without the slightest materiality or importance, except so far as that question may affect the two by which the title was changed from Mr. Kleinke to his wife; for it is clear, beyond question, that if Mrs. Kleinke, by the conveyance to her, acquired a title which was unimpeachable by future creditors, Dopslaff, having acquired her title, stands now in the strength of her title and in a position of equal security with her. And so, too, it is also entirely clear, that if Mrs. Kleinke's title was subject, while she held it, to be set aside by subsequent creditors, on the ground that it had been put in her simply for the purpose of defrauding them, Dopslaff, as her grantee, has now no better title or stronger right as against creditors than she held, unless he has shown that he is an innocent purchaser for full value.

This brings us to the first important question of the case, which is, were the deeds, by which the title was transferred from Mr. Kleinke to his wife, voluntary, or made without a consideration sufficient to entitle them to be upheld against creditors? I am convinced that they were. The lands in question were conveyed to Mr. Kleinke in June, 1883. He made the contract for their purchase, paid the purchase-money, and took the title to them in his own name. His wife did not appear in the transaction, nor was any intimation given during its progress that he represented her in it, or that she had any interest in it. In 1884 he built a house on the lands. He purchased all the material used in its erection in his own name; he hired the mechanics, and throughout the whole time occupied in its erection acted and held himself out as the builder and owner.

In 1885 he erected another building on the lands, and again acted and held himself out, during the time occupied in its erection, as though he were the builder and owner. In December, 1885, he borrowed $1,700 on mortgage on the lands. He gave his own bond for the money. His wife did not join in the bond, but executed the mortgage. He also, at the same time, gave the mortgagee what is called a lien bond, by which he and his surety

—his surety being Robert E. Gardner, one of the complainants
in this suit—bound themselves, in the sum of $3,400, that all
debts which might be filed as liens against the building then
recently erected on the mortgaged premises, should be paid, so
that the mortgage executed contemporaneously with the bond
should be the first lien on the lands. Up to that time Mrs.
Kleinke had done nothing and said nothing which indicated that
she thought she was the owner of the lands, or had the slightest
right to control their use. She never told any one that the
property was hers, nor did she ever do a single act which could
have been understood as indicating, even by way of hint, that
she thought the property was hers. Nor did her husband ever
tell any one that the property was his wife's, nor did he perform
a single act by which he recognized her as its owner. Her hus-
band continued to hold the title to the lands, and to exercise full
and complete dominion over them, as owner, until the 8th day
of February, 1887, and he then conveyed them to his wife.

The reason given for the change in the title then made is, that
the money which the husband used in paying for the land and
the buildings was the money of the wife. Mr. and Mrs. Kleinke
are Germans. They were married in 1872, in Germany. She
was a widow. They came to this country in 1880. She says
she brought nearly $3,000 with her, but is unable to state the
exact sum. This money, she says, was obtained from property
which her first husband left her, and which she sold before leav-
ing Germany, and that, from the time she came to this country
up to the time the money was expended in the purchase of the
lands and the erection of the buildings, she kept it in her bureau-
drawer. The husband also says that the lands and buildings
were paid for with his wife's money. The conduct of both,
however, stands in such sharp contradiction of their stories that
I find it impossible to believe what they say. As already stated,
all they did and said when the lands were purchased and while
the buildings were being erected went to show that the husband
was the owner and builder, and not his wife. Mrs. Kleinke's
story is extremely meagre and highly improbable. She does not
tell how she acquired the property from her first husband,

whether by will or otherwise, the proceeds of which she says were used in paying for the lands and buildings; nor does she tell of what the property consisted, whether real or personal property; nor to whom she sold it, nor what she got for it, nor in what form she brought the money to this country, whether it was in coin or a draft; nor when, nor through whom she had what she brought from Europe to this country turned into money. If her story is true, that when she came to this country she brought with her nearly $3,000, she could very easily have corroborated her evidence in some one of these particulars in such manner as to render her story probable and easy to be believed. But the part of her evidence which shocks my credulity the most, is that in which she says, that, for over two years, she kept nearly $3,000 in her bureau-drawer. Her statement to that effect imputes to her conduct so contrary to the usual caution of her race, and is so improbable .in itself, that I do not think any discriminating mind can credit it on the simple uncorroborated assertion of a witness who is as deeply interested in the result of a suit as Mrs. Kleinke is in the result of this suit, and who has in no way, by the evidence he or she has given, established a special claim to confidence. The proofs entirely fail to satisfy my judgment that the money of Mrs. Kleinke paid for the lands and buildings; they, on the contrary, I think, show that the money used for those purposes was the money of her husband.

The deeds by which the title was changed from the husband to the wife must be held to have been voluntary, and they are consequently void as against the complainants as existing creditors.

The proofs already considered go far to show, as will have been seen, that the change of title from the husband to the wife was made with intent to defraud future creditors. To my mind, it is painfully evident that the consideration put forward to vindicate the honesty and legality of that transaction never had any existence in fact, but was a fraudulent invention. The real purpose of the change was made to put the property out of the reach of the husband's creditors, and at the same time to place it

in such a position that he might, after the change, have practically the same use and enjoyment of it that he had had before. For some years prior to the change, the husband had been engaged in business as a builder; he was so engaged at the time of the change; he continued his business afterward, without changing either its volume or the manner of conducting it; he continued to purchase material on credit afterward just as he had before. By the change he passed his property to his wife and made himself insolvent. He not only stripped himself of the means to pay the debts which he had already contracted, but he placed those who should thereafter give him credit in a position where they would be compelled to bear all the risks of his business. By the change he so arranged affairs that if his business was successful he might reap the benefit of it, but if it was unsuccessful his creditors would be compelled to bear the loss. And he did this without informing those from whom he subsequently solicited credit that he had impoverished himself by passing all his property over to his wife. In the presence of these facts, I do not think it can be doubted, that one of the purposes which the parties had in view in changing the title was to defraud future creditors.

The proofs show also, I think, that the deed to Dopslaff was made without consideration, and that it was executed with intent to prevent the complainants from collecting their debts. Dr. Elder swears that Dopslaff admitted to him that he took title to the lands to prevent the complainants from collecting their debts. I know of no reason why the doctor's evidence should not be believed. He has no interest in this suit. He is a gentleman of high respectability. He was not unfriendly to Dopslaff; on the contrary, his relations to him were such as to render it highly probable that he would not say anything to the prejudice of Dopslaff if he could help it. He was Dopslaff's family physician; Dopslaff was acting as the doctor's agent in the sale of lots; besides, the doctor, less than a year before the admission was made, had conveyed a house and lot to Dopslaff on which Dopslaff had given him a mortgage for $1,300. These facts make it quite certain that the doctor would be much more eager

to help Dopslaff than to harm him. It appears, moreover, that Dopslaff, when first examined on this subject, said nothing in contradiction of the doctor's evidence, but gave his evidence in such form as to simply say that he did not recollect. He says, that the conversation on this topic was opened by the doctor's asking him how he came to buy the Kleinke property, and that he replied that he had bought it to save his money, and then adds: "I don't remember if there was more said; he was there when I came home; I only spoke to him about five minutes." It will be observed that his memory, like that of most witnesses who are willing to suppress or evade the truth, but not to deny it squarely, fails him at the crucial point of his story.

There are other facts in the case pointing very strongly in the same direction. Dopslaff is the son of Mrs. Kleinke. Her first husband was his father. Nine hundred and forty dollars of the consideration, which it is said Dopslaff paid for the conveyance to him, was paid by the cancellation of a debt, which it is said was due to him from his mother. The story of the defendants respecting the origin of this debt is the following: they say that Dopslaff, on his return from Cincinnati, in the Spring of 1883, placed $300 in the hands of his mother for safe-keeping, and that subsequently he gave her, of the wages which he earned after his return from Cincinnati, $290 more, and that this was also put in her hands for safe-keeping. And they also say, that there was due to him for work, which he did in the erection of the two buildings on the lands in question, the sum of $250, making a total, without interest, of $840. Dopslaff, on his return from Cincinnati, was only about nineteen years of age. He says he earned the $300 in Cincinnati. The whole of the $840 was due to him, it will be seen, when he purchased the house and lot of Dr. Elder, yet it is not pretended that he told the doctor that this money was due to him, nor, so far as appears, did he make the slightest effort to collect it, in order that he might use it in paying for the house and lot. Five hundred and ninety dollars of it, it will be remembered, had been left with his mother merely for safe-keeping, to be returned to him whenever he wanted. Now, it seems utterly incredible to me that

Dopslaff should, if the truth was that his mother held this large sum of money for him, have given Dr. Elder a mortgage for $1,300, without first making some effort to collect it. The fact that he did not do so furnishes very strong evidence, I think, that his present claim is a fabrication. Another important fact appears in connection with the claim, that Mrs. Kleinke was largely indebted to Dopslaff. Dopslaff says that he had a book in which he had entered his claims against his mother. His mother says that she had another, in which she had entered the sums received from her son. Neither is produced. Mr. Kleinke also says, that he had a book in which he had entered the time that Dopslaff worked on the two buildings, and that it remained in his possession as late as August, 1888—that was the month in which his answer and that of his wife in this suit were filed—but after that, he says, "I could not find the book any more." These books would, unquestionably, furnish very strong evidence, one way or the other, respecting the true character of the claims set up by Dopslaff. There is but one deduction to be made from their disappearance. The disappearance of one might have suggested but little, but the meaning of the disappearance of all three cannot be mistaken.

The lands in question were conveyed to Dopslaff on the 14th day of March, 1888. At that time, Dopslaff says, he had not heard that Kleinke was indebted to the complainants. The suit of John Gardner was commenced in November, 1887, and that of Gardner & Weeks in January, 1888. Kleinke had procured the lawyer who drew and acknowledged the deed to Dopslaff, to file pleas in both suits. The proofs show, indeed, that the bargain, which the deed to Dopslaff consummated, was made at the office of this lawyer on the very day that the deed was executed. The circumstances attending his purchase, as related by Dopslaff himself, were the following: He says, about a week before the lands were conveyed to him, he went to his mother and told her he wanted his money to pay off a mortgage; that she replied that she could not pay him, but if he must have his money she would sell him the lands, and that he then said he wanted his money or else the property. Nothing further was

Gardner v. Kleinke.

said or done at this interview, but after the lapse of about a week, he says that he and his wife, and Mr. and Mrs. Kleinke, all went to the office of the lawyer who had filed pleas for Mr. Kleinke in the suits at law, and that it was there agreed that Mrs. Kleinke should convey the lands to him for $5,000, and that the bargain was immediately, on the same day, carried into effect. He says that he paid the consideration as follows:

| | | |
|---|---:|---:|
| By assuming the payment of two mortgages amounting, with interest, to | $2,236 | 87 |
| By giving Mrs. Kleinke a mortgage for | 1,000 | 00 |
| And also a note at one year for | 763 | 13 |
| By the cancellation of his debt against Mrs. Kleinke, which, with an addition of $100 for interest, amounted to | 940 | 00 |
| And by a cash payment of | 60 | 00 |
| | $5,000 | 00 |

By this arrangement, it will be observed, that, instead of getting money to pay his mortgage, and thus reducing his indebtedness, he increased his indebtedness from $1,300 to over $5,000. If his object was, as he says he stated it to Dr. Elder, namely, to save his money, it is difficult to understand why he did not say to his mother, when she told him she could not pay him, and proposed to sell him the property, that he did not want to buy, but would take a mortgage. A mortgage would have made his debt perfectly secure, and left him free from additional pecuniary obligation. That course, however, would have left the title to the lands in his mother, and subject to attack by the creditors of Mr. Kleinke. And it is quite plain, I think, that that is one of the things which the parties intended, if possible, to prevent. But the most inexplicable part of Dopslaff's conduct, is to see why, in view of the facts as he states them, he became so suddenly eager and determined to collect the money which he says his mother owed him. If he had not heard of the complainants' suits, and he swears positively that he had not, there was no reason for alarm. Nothing else had occurred which could have led him to suspect that his mother's title was in danger of being attacked, and there was no reason, therefore, why he should have supposed that his debt was in jeopardy, or

that any action on his part was necessary to save his money. On the same day that the property was conveyed to him, Dopslaff leased it to his mother, for a year, at a monthly rental of $36. He did this without inquiry as to the amount of rent which the property was then yielding. The amount he agreed to accept was considerably less than the property was in fact then producing.

The proofs show, I think, that all the conveyances assailed were made with intent to defraud both existing and future creditors, and they must, therefore, be declared void, as to the complainants.